140 P.3d 377

William HAOLE, IV, Plaintiff–Appellee,

v.

STATE of Hawai'i, Defendant–Appellee,

and

Matson Terminals, Inc., Defendant–Appellant,

and

John Does 1–20, Defendants.

State of Hawai'i, Third–Party Plaintiff–Appellee,

v.

Eric Rapoza and McCabe Hamilton & Renny Co., Ltd., Third–Party Defendants–Appellants.

No. 27010.

Supreme Court of Hawai'i.

Aug. 7, 2006.

John R. Lacy and Randolf L.M. Baldemor (of Goodsill Anderson Quinn & Stifel), Honolulu, on the briefs, for defendant-appellant Matson Terminals, Inc.

John S. Nishimoto, Diane W. Wong, and Zale T. Okazaki (of Ayabe Chong Nishimoto Sia & Nakamura), Honolulu, on the briefs,

for third-party defendants-appellants Eric Rapoza and McCabe Hamilton & Renny Co., Ltd.

Richard K. Griffith, on the briefs, for plaintiff-appellee.

Deirdre Marie–Iha and Dorothy D. Sellers, Deputy Attorneys General, on the briefs, for defendant-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

The dispute in the instant appeal centers around the validity and enforceability of Hawai'i Administrative Rule (HAR) § 19–41–7 (2005), quoted *infra*, that imposes a duty upon, *inter alia*, owners and operators conducting unloading activities on state piers to defend and indemnify the State of Hawai'i (the State) against any and all claims arising from such activities, except where the State is proven to be solely and legally negligent. In this case, plaintiff-appellee William Haole, IV, an employee of third-party defendant-appellant McCabe Hamilton Renny & Co., Inc. (McCabe), was injured while riding as a passenger in an automobile being unloaded at the Honolulu Harbor. The vehicle was being driven by third-party defendant-appellant Eric Rapoza, who was also employed by McCabe. As a result of the accident, Haole brought a personal injury action against defendant-appellant Matson Terminals, Inc. (Matson), which had subcontracted with McCabe to conduct cargo loading and unloading activities, and defendant/third-party

plaintiff-appellee Department of Transportation of the State of Hawai'i [hereinafter, the DOT or the State], which owns and manages the Honolulu Harbor. The State, in turn, cross-claimed against Matson and filed a third-party complaint against Rapoza and McCabe, essentially seeking to enforce HAR § 19–41–7's alleged duty to defend and indemnify provisions.

On October 5, 2004, the Circuit Court of the First Circuit, the Honorable Karen S. Ahn presiding, entered its order granting partial summary judgment in favor of the State. The circuit court concluded that Rapoza and McCabe [hereinafter, the McCabe parties], as well as Matson [hereinafter, Matson and the McCabe parties are collectively referred to as the appellants], owed a duty to defend the State in the action brought by Haole. The order was certified and entered as a final judgment, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2004),[1] on December 16, 2004.

On appeal, the appellants essentially contend that the circuit court erred in (1) concluding that the appellants are required to defend the State pursuant to HAR § 19–41–7 because (a) the DOT did not have authority to promulgate and enforce HAR § 19–41–7 and (b) the regulation violates public policy. Matson additionally contends that the circuit court erred in (1) failing to address whether, under HAR § 19–41–7, the State was "solely and legally" negligent and (2) ruling that the State's claims are not barred by the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(a) (1984).[2]

---

1. HRCP Rule 54(b) provides in pertinent part:

 **Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment[.]

 (Bold emphasis in original.)

2. 33 U.S.C. § 905, entitled "Exclusiveness of liability," provides in pertinent part:

 (a) Employer liability; failure of employer to secure payment of compensation.

*The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee … may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury*

For the reasons discussed below, we conclude that the DOT did not have authority to promulgate HAR § 19–41–7; therefore, the regulation is not valid nor enforceable. Accordingly, inasmuch as HAR § 19–41–7 does not impose upon the appellants a duty to defend or indemnify the State against Haole's claims, we hold that the circuit court erred in granting summary judgment in favor of the State. Consequently, we vacate the December 16, 2004 final judgment and remand this case to the circuit court for further proceedings.

## I. BACKGROUND

### A. Factual Background

Sometime prior to December 2002, Matson hired McCabe to perform stevedoring work, including the loading and unloading of barges at Honolulu Harbor. Matson was a paying "tenant" and was assigned a storage space near Piers 25 and 26 by Harold Watanabe, a marine cargo specialist for the DOT's Harbors Division. In assigning the storage area, Watanabe was aware that Matson would be using the area to load and off-load vehicles. Matson did not sign a contract for the use of the storage area, nor did it enter into any formal agreement with Watanabe at that time.

On December 16, 2002, Rapoza (Haole's supervisor) and Haole were off-loading vehicles from the barge Waialeale, docked at Pier 29. While doing so, Rapoza allegedly offered Haole a ride in one of the vehicles, despite Matson's safety policy prohibiting passengers riding in vehicles being off-loaded. On the way to the storage/pick up area, the vehicle collided with a steel pipe that was apparently protruding approximately ten inches above the pier's flooring. Haole, who admittedly was not wearing a seatbelt, sustained unspecified injuries as a result of the collision.

The accident occurred near Piers 25 and 26 in the vicinity of Matson's storage/pickup area. At all relevant times herein, Piers 25 and 26 were owned, managed, and maintained by the State. Carter Luke, the maintenance engineer for the DOT's Harbors Division, testified at his deposition that the protruding pipe was probably part of an old "vapor recovery system" that had been used previously at the pier. According to Luke, the pipe should have been removed pursuant to a State demolition plan, which called for the removal of "everything above ground" along the piers. Luke stated that he had seen the protruding pipe several months before the accident and that, although there was vegetation around it, the pipe was visible during the day from at least one hundred feet away.

### B. Procedural History

On June 6, 2003, Haole filed an amended complaint against both Matson and the State, alleging that their negligence in failing to remove the steel pipe caused his injuries. Subsequent to the filing of responsive pleadings by the State and the appellants, as well as the State's third-party complaint against the McCabe parties, the State tendered its defense to the appellants, pursuant to HAR § 19–41–7. The McCabe parties and Matson each rejected the State's tender in August 2003 and March 2004, respectively.

On May 27, 2004, the State moved for partial summary judgment against the appellants based upon the appellants' purported duty to defend the State against Haole's claims, pursuant to HAR § 19–41–7. The State maintained that the DOT's Harbors Division is statutorily authorized to promulgate HAR § 19–41–7 and that the rule was validly adopted. Relying on the plain language of the DOT's statutory rule-making authority, the State argued that all users of the State's commercial harbors are bound by its terms. Because the State believed it was not likely that it was "solely and legally negligent," it requested the circuit court to rule that the appellants were obligated, under HAR § 19–41–7, to defend the State in the Haole lawsuit.

was due to the contributory negligence of the employee. For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcon-

tractor fails to secure the payment of compensation as required by section 904 of this title. (Emphasis added.)

The McCabe parties countered that HAR § 19–41–7 is: (1) not authorized by the DOT's governing statutes; (2) void as against public policy; and (3) unconstitutional. Matson made similar arguments and also contended that, even if HAR § 19–41–7 was enforceable, it did not apply because (1) the State was "solely and legally negligent" for the accident and (2) the State was barred from bringing its claim against Matson by the LHWCA, quoted *supra* at note 2. On July 13, 2004, Matson also filed a cross-motion for summary judgment against the State, asserting that it was not required to defend and indemnify the State. On the same day, Matson moved for summary judgment against Haole on the ground that his claims are barred by the exclusivity provision of the LHWCA. Thereafter, on August 5, 2004, the parties stipulated to a voluntary dismissal of Haole's claims against Matson, but agreed that the dismissal would not affect the existing cross-claims and cross-actions between the parties.[3]

On October 5, 2004, the circuit court ruled that the promulgation of HAR § 19–41–7 was a proper exercise of the DOT's delegated authority and made the following relevant findings:

1. The parties do not dispute the salient facts. Resolution of the following issues involves questions of law.

2. In [Hawai'i Revised Statutes (HRS) § 266–2 (1993), quoted *infra*], the State legislature delegated to [the DOT], "all the powers ... which may lawfully be exercised by or under the State relative to the control and management of commercial harbors, ... docks, ... piers, ... belonging to or controlled by the State, and all the shipping using the same."

3. [HRS § 266–2] further gives the DOT authority to "regulate the use of" commercial docks, piers, and landings; to adopt rules pursuant to [HRS chapter 91]; and to have all powers necessary to fully carry out" [HRS chapter 266].

4. [HRS § 266–3 (1993), quoted *infra*,] empowers the Director of [the DOT] to adopt rules necessary for "the proper reg-

ulation and control of all shipping in the commercial harbors ... and for the regulation and control of all other matters and things connected with such shipping." These rules have the force and effect of law. [HRS § 266–3].

5. Under [HRS § 266–4 (1993), quoted *infra*], limitations upon the jurisdiction and powers conferred on the DOT are "as may be imposed by the statutes of the State."

6. Thus, the [l]egislature delegated broad authority to [the] DOT.

7. Pursuant to these delegated powers, DOT's director promulgated HAR 19–41–7[, quoted *infra*,] and HAR 19–41–5[, see *infra* note 11] (hereinafter, "rules"). HAR 19–41–7 limits the duty to defend to claims incident to or resulting from operations on DOT property and use of its facilities as may be involved in loading or unloading, and is excepted from circumstances in which the [State] is proven to be solely and legally negligent. There has been no contention that, procedurally, these rules were improperly established. Where an administrative agency is charged with the responsibility of carrying out the mandate of a statute, which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous. *Hyatt Corp. v. Honolulu Liquor Commission*, 69 Haw. 238, 242–43[, 738 P.2d 1205, 1208] (1987).

8. On occasion, the State [l]egislature has chosen to speak directly to the issue of private entities holding completely harmless the State of Hawai'i as a condition of use. *See* [HRS §§ 142–61 and 440G–8.2]. The parties have not contended that such statutory provisions represent an unlawful exercise of legislative discretion.

9. This [c]ourt cannot find that, in promulgating HAR 19–41–7 and HAR 19–41–5, [the] DOT exceeded the broad statutory authority delegated by the State [l]egislature or intepreted the relevant statutes

---

**3.** In anticipation of the August 5, 2004 stipulation dismissing Haole's claims against Matson, Matson withdrew its motion for summary judgment against Haole on August 3, 2004.

impermissibly or in contravention to the Legislature's manifest purpose, or that the DOT's construction of [HRS chapter 266], was palpably erroneous. *See Hyatt, supra; Orca Bay Seafoods v. Northwest Trucking[Truck] Sales, Inc.,* 32 F.3d 433 (9th Cir.1994). Inasmuch as, under [HRS §§ 266–2 and –3], the State [l]egislature purposefully delegated all lawful powers to [the] DOT to manage, control and regulate shipping and the harbors, the rules appear to be reasonably related to carrying into effect the purposes and provisions of the legislature. *Jacober v. Sunn,* 6 Haw.App. 160, 167[, 715 P.2d 813, 819] (1986).

10. *State of Alaska v. Alyeska Pipeline Service Company,* 723 P.2d 76 ([Alaska] 1986), and *State of Arizona v. C & H Nationwide, Inc.,* [179 Ariz. 164,] 876 P.2d 1199 ([Ariz.Ct.App.] 1994), are distinguishable because the delegations of power in those two cases were narrower than the broad delegation involved in this case.

11. Under these circumstances, the rules are not void as a matter of public policy.

12. At the time of the events at issue, under the rules, [Matson and the McCabe parties] each was an "operator" unloading cargo at a State wharf with "operations" on DOT property and which was engaged in the "use" of DOT facilities and was a "user" of such facilities. . . .

13. . . . The relevant pleadings and other filings establish a sufficient possibility of the applicability of the rules to [the appellants], and that the [State] will not be determined to be solely legally negligent.

14. [The appellants]' duties to defend are based upon the rules herein discussed, and not on account of plaintiff's alleged injuries. Therefore, although plaintiff's "employer" for purposes of the [LHWCA], Matson Terminals is not foreclosed by that act from providing a defense for the [State]. *See Pennisi v. Standard Fruit & Steamship Co.,* 206 A.D.2d 290[, 614 N.Y.S.2d 519] (N.Y.App.Div.1994).

Based on its findings, the circuit court granted the State's motion for partial summary judgment and denied appellants' motions.

On October 13, 2004, the McCabe parties moved for certification of the judgment as final and separate, pursuant to HRCP Rule 54(b), and for a stay of proceedings pending appeal. Matson filed a similar motion on October 15, 2004 and subsequently joined in the McCabe parties' motion on October 28, 2004.

On December 16, 2004, the circuit court entered its order granting the motions for certification and for a stay of proceedings. On the same day, the circuit court entered its judgment certifying its October 5, 2004 order granting partial summary judgment in favor of the State, ruling that appellants have a duty to defend the State against Haole's claims.

On December 20, 2004, the McCabe parties filed a timely notice of appeal, amending it on December 29, 2004 and again on January 11, 2005. On January 11, 2005, Matson also filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

■ This court reviews a circuit court's grant or denial of summary judgment *de novo* under the same standard applied by the circuit court. *Hawai'i Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (citation omitted).

### B. Statutory Interpretation

■ The interpretation of a statute is a question of law that is reviewed *de novo.*

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists[.]

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it [ ] to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*Morgan v. Planning Dep't, County of Kaua'i*, 104 Hawai'i 173, 179–80, 86 P.3d 982, 988–89 (2004) (citations and internal quotation marks omitted).

[W]here an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

*Id.* at 180, 86 P.3d at 989 (citing *Ka Pa'akai O Ka 'Aina v. Land Use Comm'n, State of Hawai'i*, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000)). Stated differently:

Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review. *Vail v. Employees' Retirement System*, 75 Haw. 42, 59, 856 P.2d 1227, 1237 (1993). However, an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate. *Kahana Sunset Owners v. County of Maui*, 86 Hawai'i 66, 72, 947 P.2d 378, 384 (1997).

*TIG Ins. Co. v. Kauhane*, 101 Hawai'i 311, 321, 67 P.3d 810, 820 (App.2003) (brackets and internal quotation marks omitted).

## III. *DISCUSSION*

HAR § 19–41–7 provides:

Liability. Agencies, masters, *owners, operators,* or charterers loading or *unloading at state wharves shall* **indemnify, defend,** *and save harmless the department, its members, and employees from and against all losses, claims, demands, and suits for damages, including death and personal injury,* and including costs and attorneys' fees, *incident to or resulting from their operations on the property of the department* and the use of its facilities **except where the department has been proven to be solely and legally negligent**.

(Emphases added.) The aforementioned rule not only imposes upon private parties a duty to defend the State, but also shifts liability from the State to such private parties, except in circumstances where the State is proven to be "solely and legally negligent." Although Hawai'i's appellate courts have not had occasion to address the validity and enforceability of a regulatory duty to defend, the Intermediate Court of Appeals' (ICA) decision in *Pancakes of Hawai'i v. Pomare Properties Corp.*, 85 Hawai'i 286, 291, 944 P.2d 83, 88 (App.1997), provides some preliminary guidance. In that case, which involved a contractual duty to defend in a non-insurance context, the ICA stated:

In our opinion, the procedure used to determine the duty to defend based on indemnity contracts can follow the same procedure used in the insurance context. *If a complaint alleges claims that fall within the coverage of the indemnity provision, then, according to the* **complaint allegation rule,** *the duty to defend begins.* This is separate and distinct from the duty to indemnify. Once the trier of fact makes a determination on the claims in the lawsuit, the duty to indemnify will either arise or lie dormant. Claims falling within the indemnity provision will trigger the duty to indemnify, while claims falling outside the provision will relieve the indemnitor of his or her duty to indemnify. In our view, this

is the only equitable interpretation that gives life to non-insurance indemnity clauses and prevents indemnitors from benumbing the duty to defend until after a case has been litigated.

... Accordingly, we hold that the duty to defend based on a contractual indemnity clause must be determined at the onset of litigation using the complaint allegation rule.

*Id.* at 291–92, 944 P.2d at 88–89 (emphases added). In other words, under the "complaint allegation rule," if there is no potential for indemnification, then no duty to defend will arise. Accordingly, even though the State sought and obtained summary judgment based upon only the appellants' duty to defend, we focus our analysis upon the duty to indemnify and whether a valid duty to indemnify exists under HAR § 19–41–7.

### A. Duty to Indemnify and the Validity of HAR § 19–41–7's Indemnification Provision

Pursuant to the State Tort Liability Act, the State, generally, is liable for actual damages caused by the negligence of its employees "in the same manner and to the same extent as a private individual under like circumstances." HRS § 662–2 (1993).[4] In addition, where a government entity is determined to be a joint tortfeasor along with a private party, the government entity is "liable for no more than that percentage share of the damages attributable to the government entity." HRS § 663–10.5 (Supp.2002).[5] This court has consistently held that private parties may *contract* to indemnify the indemnitee for the indemnitee's own negligence but there must be a "clear and unequivocal" as-

sumption of liability by one party for the other party's negligence. *Kamali v. Hawai'ian Elec. Co.*, 54 Haw. 153, 162, 504 P.2d 861, 866 (1972); *Keawe v. Hawai'ian Elec. Co., Inc.*, 65 Haw. 232, 237, 649 P.2d 1149, 1153 (1982); *Espaniola v. Cawdrey Mars Joint Venture*, 68 Haw. 171, 178, 707 P.2d 365, 369 (1985).

Here, the parties agree that the DOT "*could* require by contract what it does here by regulation." However, absent their clear and unequivocal assumption of the State's liability, the appellants contend that the duty to indemnify cannot be imposed upon them via the HAR. Specifically, the appellants argue that: (1) the DOT's governing statutes do not explicitly authorize the DOT to issue administrative rules exonerating the State from the negligence of its employees, nor do they explicitly allow the DOT to require private entities to defend and indemnify the State for the negligence of its employees; (2) the regulation does not bear a reasonable relationship to the DOT's statutory mandate; and (3) the legislature's imposition of a statutory duty to defend and/or indemnify on other occasions demonstrates the legislature's clear intent to reserve to itself the power to impose upon others a duty to defend and indemnify the State and does not consider such authority to be implicitly afforded to State agencies.

The State, on the other hand, maintains that, although the governing statutes do not explicitly authorize the DOT to impose a duty to defend or indemnify, the regulation was nevertheless within the DOT's powers to promulgate. The State argues that: (1) no "magic words" are required to support the regulation; (2) the existence of unrelated

---

4. HRS § 662–2 provides in relevant part:

 **Waiver and liability of State.** The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
 (Bold emphasis in original.)

5. HRS § 663–10.5 provides in pertinent part:

 [I]n any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, *the government enti-*

 *ty shall be liable for no more than that percentage share of the damages attributable to the government entity.*
 For purposes of this section, "government entity" means any unit of government in this State, including the State and any county or combination of counties, department ... or other establishment owned, operated, or managed by or on behalf of this State or any county.
 For purposes of this section, the liability of a government shall include its vicarious liability for the acts or omissions of its officers and employees.
 (Emphasis added.)

statutory duties to indemnify does not limit the DOT's delegated authority; and (3) other Hawai'i agencies have enacted rules requiring indemnification or a defense, using similar statutory delegations. In analyzing the parties' contentions, we first examine the DOT's rule-making authority.

### 1. DOT's Rule-making Authority

 We begin with the proposition that

> [a] public administrative agency possesses only such rule-making authority as is delegated to it by the state legislature and may only exercise this power within the framework of the statute under which it is conferred. Administrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down.

*Stop H-3 Ass'n v. State Dept. of Transp.*, 68 Haw. 154, 161, 706 P.2d 446, 451 (1985) (internal citations omitted); *see also Puana v. Sunn*, 69 Haw. 187, 189, 737 P.2d 867, 870 (1987) (an agency's authority "is limited to enacting rules which carry out and further the purposes of the legislation and do not enlarge, alter, or restrict the provisions of the act being administered"). In other words,

an administrative agency can only wield powers expressly or implicitly granted to it by statute. However, it is well established that an administrative agency's authority includes those implied powers that are *reasonably necessary to carry out the powers expressly granted.* The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency.

*Morgan*, 104 Hawai'i at 184, 86 P.3d at 993 (internal quotation marks, brackets, citations, and ellipses omitted) (emphasis added).

The DOT's authority to regulate and control the State's harbors is found in three statutes: (1) HRS § 26-19 (1993), which states in pertinent part that "[t]he [DOT] shall *establish, maintain, and operate* transportation facilities of the State, including ... harbors [ ] and such other transportation facilities and activities as may be authorized by law" (emphasis added); (2) HRS § 266-2 (1993), which describes the powers and duties of the department;[6] and (3) HRS § 266-3 (1993), which specifically defines the DOT's rule-making authority.[7] The authority to promulgate rules, however, is not without restrictions. *See* HRS § 266-4 (1993) (providing that "[t]he jurisdiction and powers conferred on the [DOT] are subject to such restrictions as may be imposed by the stat-

---

**6.** HRS § 266-2 provides in relevant part:

(a) The department of transportation shall:

(1) *Have and exercise all the powers and shall perform all the duties which may lawfully be exercised by or under the State relative to the control and management of commercial harbors,* ... docks, wharves, piers, ... and landings belonging to or controlled by the State and the shipping using the same;

(2) *Have the authority to use and permit and regulate the use of the commercial docks, wharves, piers ... and landings belonging to or controlled by the State for ... loading and landing merchandise[;]*

. . . .

(6) Adopt rules pursuant to [C]hapter 91 and not inconsistent with law; and

(7) *Generally have all powers necessary to fully carry out this chapter.*

(Emphases added.)

**7.** HRS § 266-3 provides in relevant part:

(a) The director of transportation may adopt rules as necessary to:

. . . .

(5) *Defining the duties and powers of carriers, shippers, and consignees respecting passengers, freight, goods, wares, and merchandise in and upon the docks,* wharves, piers ... within the commercial harbors, ports, and roadsteads of the State. *The director may also make further rules for the safety of the docks, wharves, piers, ... and landings on, in, near, or affecting a commercial harbor and waterfront improvements belonging to or controlled by the State.*

(b) *The director may also adopt, amend, and repeal such rules as are necessary:*

(1) *For the proper regulation and control of all shipping in the commercial harbors belonging to or controlled by the State ... and for the regulation and control of all other matters and things connected with such shipping;*

. . . .

(c) *The rules shall be adopted in the manner prescribed in [C]hapter 91 and shall have the force and effect of law.*

(Emphases added.)

utes of the State, and shall be exercised in accordance with the provisions thereof"). We, therefore, examine whether the DOT's governing statutes authorize the promulgation of HAR § 19–41–7.

### 2. Whether the DOT's Governing Statutes Authorize Promulgation of HAR § 19–41–7

#### a. *plain language of the DOT's governing statutes*

■ The State acknowledges that the DOT's governing statutes do not "specifically mention a duty to defend [or indemnify]"; however, it argues that the absence of such specificity "is not dispositive." In the State's view, the appellants "misunderstand the nature of statutory delegation" and the fact that "[t]he statute's exact words are *not* controlling." (Emphasis in original.) The State argues that "[t]he legislature never intended to meticulously delineate each of the agency's specific powers" and that, "[a]s long as the rule is consistent with the grant of statutory authority, it is valid."

The relevant governing statutes grant to the DOT "all powers necessary" for it to regulate and control the state's harbors. HRS § 266–2. However, the grant of the DOT's rule-making authority to carry out its function is specifically defined. First, the power to "define the duties" of "carriers, shippers, and consignees" under HRS § 266–3(a)(5) refers to duties *"respecting passengers, freight, goods, wares, and merchandise in and upon the docks."* (Emphasis added.) Nowhere in the governing statutes is there a specific delegation of power to the DOT to define the duties owed by such "carriers, shippers, and consignees" *to the State* as the indemnitee. *See Kamali,* 54 Haw. at 159, 504 P.2d at 865 ("[a] third party claim for indemnity is . . . for reimbursement based upon contract or some other independent duty existing between indemnitor and indemnitee.") Second, although the State argues that the power is that which is "reasonably necessary" and without which the "DOT would not be able to fully manage the State harbors," the State admits—and, as previously mentioned, all the parties agree—that the DOT *"could* require by contract what it does

here by regulation." We note that there is no evidence in the record to suggest that the DOT's state harbor operations would be significantly hampered were it required to contract with harbor users for indemnification. Third, even though HRS § 266–3(a)(5) also authorizes the DOT to enact regulations for the safety of the docks, there is no evidence—and the State does not even allege—that imposing liability for the State's negligence upon harbor users contributes to increased safety. Finally, under HRS § 266–3(b)(1), the only other general rule-making provision in that section, the DOT may enact rules necessary to regulate and control "all shipping" and "all other matters and things connected with such shipping." Although broad in scope, the above provision—like the remaining provisions of the relevant governing statutes—does not explicitly state that the DOT's rule-making authority includes the power to impose a duty of indemnification.

#### b. *implied authority*

■ The State maintains that the challenged-regulation is reasonably necessary and reasonably related to carrying out the DOT's statutory mandate. Specifically, the State argues that the enactment of HAR § 19–41–7

> was *"reasonably necessary* to carry out" [the] DOT's express and broad grant of authority. *Without it, DOT would not be able to fully manage the State harbors, "define the duties"* of those transporting freight, and *"have and exercise all the powers which may lawfully be exercised by or under the State."*

(Brackets in original.) (Ellipses points and citation omitted.) The McCabe parties argue that, although HRS § 266–2 grants the DOT " 'all the powers' which may lawfully be exercised by or under the State 'relative to the control or management' of commercial harbors, . . . [t]he language 'control and management' does not automatically confer the authority to require indemnification" and that, therefore, the authority to require indemnification cannot be implied from the governing statutes. Matson agrees and additionally argues that the regulation at issue is not reasonably related to the "administration

for which the rules and regulations were authorized to accomplish."

Here, the circuit court concluded that, in promulgating HAR § 19–41–7, the DOT did not exceed the "broad statutory authority" delegated by the legislature, citing *Hyatt Corporation v. Honolulu Liquor Commission,* 69 Haw. 238, 738 P.2d 1205, *reconsideration denied* (1987), and *Orca Bay Seafoods v. Northwest Truck Sales, Inc.,* 32 F.3d 433 (9th Cir.1994). In the former case, Hyatt sought to enjoin the Honolulu Liquor Commission (Commission) from enforcing HAR § 7–21, which prohibited liquor licensees from engaging in discriminatory practices. *Hyatt Corp.,* 69 Haw. at 239, 738 P.2d at 1205. In determining the extent of the Commission's authority, this court recognized that:

> The problems associated with intoxicating liquor have been a matter of concern for legislative bodies in this country for over three centuries. *See* 45 Am.Jur.2d, *Intoxicating Liquors* § 1 (1969).

> [B]ecause of the nature of intoxicating liquor and the enormous problems developed by the traffic in them, *the police power of the State in this area of human activity has been recognized,* consistently with any and all aspects of constitutional limitations, *to be the most fulsome embodied in the concept of sovereignty.* B.P.O.E. *Lodge No.2043 of Brunswick v. Ingraham,* 297 A.2d 607, 611 (Me.[1972]), appeal dismissed (for want of a substantial federal question) 411 U.S. 924, 93 S.Ct. 1893, 36 L.Ed.2d 386 (1972)[1973]. *See Crane v. Campbell,* 245 U.S. 304, 307, 38 S.Ct. 98, 99, 62 L.Ed.2d[L.Ed.] 304, 309 (1917).

> *"The [Hawai'i State] legislature has vested unusually broad discretionary powers in the liquor commissions ...."* H. Wattel & P. Putnam, *Intoxicating Liquor Laws in Hawai'i and the Industry,* at 31–32 (Leg. Ref. Bureau Rep. No. 2, 1969).

*Id.* at 241, 738 P.2d at 1207 (emphases added). HRS § 281–17 (1985), the Commission's enabling statute, provided in pertinent part:

> **Jurisdiction and powers.** The liquor commission, within its own county, shall have the sole jurisdiction, power, authority, and discretion, subject only to this chapter:
>
> (1) To grant, refuse, suspend, and revoke any licenses for the manufacture, importation, and sale of liquors;
>
> (2) To control, supervise and regulate the manufacture, importation, and sale of liquors by investigation, enforcement, and education ...;
>
> (3) From time to time to make, amend, and repeal such rules, not inconsistent with this chapter, as in the judgment of the commission seem appropriate for carrying out this chapter and for the efficient administration thereof, and the proper conduct of the business of all licensees, including every matter or thing required to be done or which may be done with the approval or consent or by order or under the direction or supervision of or as prescribed by the commission; which rules, when adopted as provided in chapter 91 shall have the force and effect of law[.]

(Bold emphasis in original.) (Underscored emphases added.) In upholding the Commission's prohibition on racial discrimination, this court stated that:

> We are mindful that legislative grants of authority must be limited so as to ensure that important choices of social policy are made by the legislature, the branch of our Government most responsive to the popular will.

> The public policy of the State of Hawai'i disfavoring racial discrimination is embodied in our statutes and our Constitution. The strength of this expressed public policy against racial discrimination is beyond question.

*Id.* at 244, 738 P.2d at 1209 (citations, internal quotation marks, and footnotes omitted). This court also noted that:

> Hyatt examines specific instances where the legislature expressly prohibited discrimination and argues that where the legislature intends to prohibit discrimination, it does so expressly. However, the issue is not whether the legislature *intended* to prohibit discrimination ..., but whether the legislature, in granting broad authority

to the Commission, *permitted* the Commission to prohibit racial discrimination.

*Id.* at 244 n. 7, 738 P.2d at 1209 n. 7 (emphases in original). The court concluded that the governing statute's "extremely broad grant of authority to the Commission," coupled with "the great weight to be accorded to the Commission's construction of the statute and the strong public policy of this State against racial discrimination," mandated the conclusion that the Commission did not exceed its rule-making authority when it adopted HAR § 7-21. *Id.* at 245, 738 P.2d at 1209.

In *Orca Bay Seafoods*, the United States Court of Appeals for the Ninth Circuit addressed the validity of a regulation promulgated by the Secretary of Transportation that exempted from the Vehicle Information and Cost Savings Act, Pub.L. No. 92-513, 86 Stat. 961 (1972) (codified as amended at 15 U.S.C. §§ 1981-91), transfers of trucks with gross vehicle weight ratings of more than 16,000 pounds. *Orca Bay Seafoods*, 32 F.3d at 434. The act required that *all vehicle transfers include true odometer readings* or a disclosure that actual mileage is unknown. The Ninth Circuit struck down the regulation as invalid, concluding that, although the reasoning for such an exemption was rational, Congress had not delegated the power to create such an exemption. The court reasoned that deference to the agency's interpretation of its governing statutes was not required because

> [d]eference to administrative agencies under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984), will not save the regulation. *Chevron* deference only operates if there is ambiguity or silence in the statute:
>
> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not

directly addressed the precise question at issue, *the question for the court is whether the agency's answer is based on a permissible construction of the statute. Id.* at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted).

> In the statute at issue, Congress left no gap, no silence, no ambiguity, so "*we must give effect to the plain language that Congress chose.*" *United States v. Geyler*, 949 F.2d 280, 283 (9th Cir.1991). *The regulation is contrary to the will of Congress as expressed in the governing statute.*

*Id.* at 436-7 (emphases added).

In sum, *Hyatt Corp.* and *Orca Bay Seafoods* represent two ends of the spectrum. The Liquor Commission's power to "regulate the conduct of business of all licensees" was considered "extremely broad" and permitted the Commission to prescribe rules prohibiting licensees, including Hyatt, from discriminating against customers. In contrast, Congress had directly spoken on the subject of the regulation at issue in *Orca Bay Seafoods.*

The instant case, however, is distinguishable from the above cases. In *Hyatt Corp.*, the Liquor Commission was granted "extremely" broad authority to regulate "the proper conduct of business of all licensees." 69 Haw. at 245, 738 P.2d at 1209. The regulation at issue as well as the other statutes raised by Hyatt were *consistent* with the legislature's "strong public policy" against racial discrimination. In reviewing the question whether the Commission was *permitted* to enact its regulations given its "broad grant of authority," this court looked to the legislature's policy regarding discrimination and determined that the regulation was permitted. In the instant case, the legislature's express policy, under the State Tort Liability Act, *see supra* note 4, is that the State is liable for its torts in the same manner as a private party in like circumstances. Thus, a regulatory shift of responsibility for the State's own negligence contravenes the State's express policy regarding liability for its torts. As previously noted, unlike *Orca Bay Seafoods*, the legislature has not spoken directly to whether the DOT may impose a regulatory duty to indemnify the State. Admittedly, the governing statutes

grant "all powers necessary" for the regulation and control of state harbors, but such powers are not so "extremely broad" as those of the Liquor Commission in *Hyatt Corp.* Indeed, the Liquor Commission's rule-making powers were generally described as permitting the regulation of, *inter alia*, the "proper conduct of the business of all licensees" as, in the commission's judgment, "seem[ed] appropriate"; whereas here, as previously discussed, the DOT's rule-making authority is specifically defined. Accordingly, we do not believe that the DOT is permitted to bypass the general requirement that parties (in this case, the State) seeking to shift liability to another (*i.e.*, the appellants) must secure the clear and unequivocal agreement of that party to assume the liability of another. *See Kamali*, 54 Haw. at 162, 504 P.2d at 866.

### c. cases addressing regulatory indemnification

The McCabe parties point to two cases— (1) *State v. Alyeska Pipeline Service Company*, 723 P.2d 76 (Alaska 1986), and (2) *State v. C & H Nationwide*, 179 Ariz. 164, 876 P.2d 1199 (Ct.App.1994)—in which courts have held regulatory indemnification unenforceable because they were not authorized by their associated-governing statutes. In *Alyeska Pipeline*, an employee of Alyeska Pipeline Service Company (Alyeska) sued the state of Alaska after she was injured on a state highway [hereinafter, the Dalton Highway], alleging that the state negligently failed to control dust on the highway. The state joined Alyeska as a third-party defendant based upon an express indemnification provision set forth in its highway use permit. Alyeska argued that the regulation requiring the indemnification provision exceeded the authority of the governing statutes. The Supreme Court of Alaska agreed with Alyeska, noting that the state's enumerated powers to control the state highway system included the rights to control access to highways and to collect tolls, fees, and charges for the use of such highways, as well as to "exercise any other power necessary to carry out the purpose" of the governing statutes. 723 P.2d at 78. The court noted that the state also had a statutory duty to main-

tain the highway and keep it open for industrial and commercial traffic. The regulations promulgated by the state prohibited travel on the Dalton Highway without a permit, which contained the following indemnity provision:

> The permittee shall indemnify and hold harmless the state and its representatives, agents, and employees from all suits, actions, or claims of any character brought because of any injuries or damages sustained by any person or property in consequence of any act or omission, in any way related, directly or indirectly, to the issuance or use of the permit, of the permittee, its representatives, agents or employees, or of the State of Alaska, its representatives, agents, or employees, or of any other person.

*Id.* at 78 (citation omitted). The Alaska Supreme Court concluded that the regulation was inconsistent with the governing statutes because it bore "no reasonable relation to the state's statutory duty to maintain the highway." *Id.*

In *C & H Nationwide*, a C & H truck, transporting an oversize load pursuant to a permit issued by the Arizona Department of Transportation (ADOT), was involved in a collision with a motorhome, resulting in the deaths of seven people. The survivors of the decedents brought a negligence action against C & H and the State of Arizona (the state). 876 P.2d at 1200. The state settled the case, and, thereafter, sought indemnification against C & H based upon an ADOT regulation generally requiring permit applicants to indemnify the state. *Id.* at 1201. The state argued that the regulation requiring indemnification was an authorized exercise of the broad powers granted to the ADOT regarding public safety and the issuance of oversize load permits. The court disagreed, stating that:

> Under A.R.S. § 28–108(A), the director of ADOT has the power to[:]
>
> > 5. Prescribe such rules as he deems *necessary for public safety and convenience.*
>
> . . . .

19. *Exercise complete and exclusive operational control and jurisdiction over the use of state highways and routes and prescribe such rules regarding such use as he deems necessary to prevent the abuse and unauthorized use of such highways and routes.*

In regard to oversize load permits, A.R.S. § 28–1011 provides:

A. [T]he director with respect to highways under the jurisdiction of the department ... may upon application in writing and good cause being shown therefor *issue a special permit in writing* authorizing the applicant to operate or move a vehicle or combination of vehicles of a size or weight of vehicle or load exceeding the maximum specified in this article ... upon any highway under the jurisdiction of the party granting the permit and for the maintenance of which the party is responsible.

. . . .

C. [T]he director ... may *issue or withhold the permit at his discretion.* If the permit is issued, the director ... may establish seasonal or other time limitations within which the vehicles described may be operated on the highways indicated or otherwise limit or prescribe conditions of operation of the vehicle or vehicles, when necessary to assure against undue damage to the road foundations, surfaces or structures, and may require such undertaking or other security as may be deemed necessary to compensate for *any injury to any roadway or road structure.*

([Italicized e]mphasis added.) Finally, A.R.S. § 28–1013 imposes liability on the drivers and owners of oversize vehicles for damage to highways or highway structures caused by the movement of these vehicles. *Nowhere in the legislation do we find any authority, expressed or implied, conferred upon the ADOT to require general indemnification by permittees. Even broadly construing the above statutory provisions, we can discern no legislative intent to require oversize load permittees to compensate the state for any damages other* than damages to highways and related structures.

*Id.* (emphases added). The court further reasoned that:

Given [the ADOT's] overall responsibility for regulating and maintaining the state's highways, it is ADOT that has superior knowledge of the general nature and conditions of the "thousands of miles of roadway it maintains," rather than carriers of oversize loads, particularly those from without the state as in this case. Moreover, ADOT has the authority to restrict the movement of dangerous oversize loads to certain routes and times that may be safer or better suited for such purposes or to impose other safeguards such as requiring escort vehicles and warning devices.

Furthermore, *absent a clear statutory directive, we do not believe that the determination whether to require indemnification is a matter for the agency to decide. Just as the decision to immunize the state from liability is properly a matter for the legislature, so also we believe is the decision to shift the state's liability to a third party* [.]

. . . .

... We agree with the trial court that[,] *had the legislature wanted to give ADOT the power to require indemnification for anything other than damage to roadways and structures, it could have done so expressly as it did in [other statutes]. In the absence of that authority, the indemnity clause is unenforceable.*

*Id.* at 1202–03 (citations omitted) (emphases added).

In the instant case, the circuit court found *Alyeska Pipeline* and *C & H Nationwide* "distinguishable because the delegations of power in those two cases were narrower than the broad delegation [to regulate and control the State harbors that is] involved in this case." Although we agree with respect to the scope of the delegation of power, we believe that some of the principles discussed therein are worthy of discussion.

Here, unlike the above cases, there is no permit required of harbor users, *i.e.* a separate agreement. Additionally, in *C & H*

158

*Nationwide,* the court noted that the permit itself did not contain a separate indemnity provision, but only cited to the regulation, stating that a permit applicant "shall agree to hold [the state] harmless[.]" 876 P.2d at 1202 n. 2. In that regard, the regulation at issue in *C & H Nationwide* is more akin to the DOT's regulation at issue here. Although the ADOT argued that, absent the regulation, "it would be required to maintain constant surveillance over the thousands of miles of roadway it maintains," *Id.* at 1202, the Arizona Court of Appeals responded that:

We find this argument unpersuasive for several reasons. The theory that a general indemnity obligation fosters safer highway operation by wide load carriers, although appealing on its face, is unsupported by any evidence in the record, and it avoids addressing potential issues concerning the state's own negligence. While imposing liability on a permittee for the state's negligence may benefit the state's coffers, we cannot see how it increases public safety, and, as C & H urges, it may actually diminish highway safety by reducing the state's incentive to avoid negligence. *See State v. Korean Air Lines [ (KAL) ] Co.,* 776 P.2d 315, 318 (Alaska 1989) (regulatory indemnity provision in state airport lease "reduces the state's incentive to avoid negligence, not only with respect to KAL and other major carriers with similar lease provisions, but also with respect to the travelling [sic] public"); *cf. Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 382, 694 P.2d 198, 212 (1984) (attempts to avoid or limit tort liability disfavored as "tending to encourage carelessness").

*Id.* Similarly, we believe that the DOT's argument that the power to require indemnification is reasonably necessary is unpersuasive. First, as previously stated, the DOT owns, operates, and manages the State's harbors, and, as such, it has superior knowledge

of the nature and conditions of its piers, wharves, commercial docks, landings, and the like. Second, given its responsibility to maintain the overall safety of the users of its harbors and related facilities, the DOT also has the authority to, *inter alia,* regulate the movement of freight from cargo ships to storage areas, designate and assign appropriate storage areas, and otherwise control loading and unloading activities. Third, like the Arizona appellate court, we also fail to see how imposing liability on harbor users for the State's negligence is reasonably necessary to maintain their safety. As observed by the court in *C & H Nationwide,* the regulatory indemnification at issue here "may actually diminish ... safety by reducing the state's incentive to avoid negligence." *Id.* And, finally, had the legislature intended to afford the DOT authority to require indemnification, except where the State is proven to be solely and legally negligent, it could have expressly done so as it has in other circumstances as discussed below.

### B. *Hawai'i Indemnification Statutes*

■ Although we acknowledge the State's argument that "the existence of unrelated statutory duties to indemnify does not limit [the] DOT's delegated authority," we also recognize that the legislature has imposed a duty to indemnify the State on private parties without requiring a separate agreement in very limited instances. For example, HRS § 142–61(g) (1993)[8] imposes on "any person who constructs or maintains" an electric fence along publicly owned lands to indemnify the public entity owning such land from all claims "arising from the use" of such fences; HRS § 286–172 (Supp.2005) requires "any person receiving information" from the statewide traffic records systems to "hold harmless the State and any agency thereof from all claims for improper use or release of such information."

All other indemnification statutes contemplate a separate agreement to shift liability

8. HRS § 142–61(g) provides:
 Any person who constructs or maintains an electrically charged fence or fence with an electrically charged attachments along the boundary of any government road or within the exterior boundaries of any leased public

land or lot shall defend, indemnify, and hold harmless, the State, county, or other public entity from all claims, suits, or judgments arising from the use of an electrically charged fence or fence with electrically charged attachments.

to the indemnitor and generally fall into three main groups. The first includes those statutes that require a written acknowledgment or agreement. *See, e.g.,* HRS § 302A–1164 [9] (Supp.2005) (requiring parents' written acknowledgment that duty to hold harmless and indemnify the Department of Health for any claims arising from the department's granting permission to students to self-administer certain medications and administering medication to students in certain emergency situations); *see also* HRS § 103F–409 (Supp.2005) (requiring all contracts for purchases of health and human services to expressly state that the recipient or provider shall indemnify and hold harmless the State from all claims, damages, and costs arising out of or in connection with the acts or omissions of the recipient or provider).

The second group of statutes requires indemnification to be included as a lease provision. *See, e.g.,* HRS § 206E–184 (Supp.2005) (regarding special facility projects under the Hawai'i Community Development Authority); *see also* HRS § 261–54 (Supp.2005) (requiring any special facility lease for aeronautical special facility projects entered into by the DOT to indemnify the department for claims arising from its use).

The third group of statutes requires an indemnification agreement as a grant condition. *See, e.g.,* HRS § 10–17 (Supp.2005) (regarding grants provided by the Office of Hawai'ian Affairs); HRS § 201–113 (Supp. 2005) (regarding grants from the Hawai'i television and film development special fund). Thus, the statutes regarding indemnification generally comport with the policy found in the State Tort Liability Act, *see supra* note 4, that the State is liable to the same extent as a private individual for its torts, *i.e.,* that parties are generally responsible for their own percentage of fault except where agreed upon by the parties.

The State maintains that:

Like DOT's enabling statutes, the delegations [to other agencies] are general and broad. These laws also govern the control and use of large, important[—]and liability-prone[—]State resources. For example, the Stadium Authority was given the statutory authority to "maintain, operate, and manage the stadium and related facilities[,]" "to exercise all powers necessary … to carry out and effectuate" this chapter, and to adopt rules as "it may deem necessary[.]" HRS § 109–2 (Supp.2004). The Stadium Authority enacted an administrative rule akin to HAR § 19–41–7:

[L]icensee shall be required to indemnify and hold harmless the State, the authority, and their officers and employees, from any and all claims for loss, injury, damage or liability sustained … by reason of the use or occupation of the stadium premises by the licensee[.]

HAR § 3–70–15(b). The Convention Center Authority did the same. *See* HRS § 206X–4(b)(4) & (b)(20)(1999) [10] (agency shall "adopt rules with respect to its projects, operations, properties, and facilities;" and "do any and all things necessary to carry out its purposes and exercise the powers granted); HAR § 15–110–40(b) (requiring licensee to indemnify the State and agency).

9. HRS § 302A–1164 provides in pertinent part:
 **§ 302A–1164 Self-administration of medication by student and emergency administration permitted.** (a) The department shall permit:
 (1) The self-administration of medication by a student for asthma, anaphylaxis, or other potentially life-threatening illnesses; and
 (2) Department employees and agents to volunteer to administer glucagon in an emergency situation to students with diabetes.
 . . . .
 (c) The department shall inform the student's parent or guardian in writing that the department and its employees or agents shall not incur any liability as a result of any injury arising from compliance with this section.

(d) The student's parent or guardian shall sign a statement acknowledging that:
 (1) The department and its employees or agents shall not incur any liability as a result of any injury arising from compliance with this section; and
 (2) The parent or guardian shall indemnify and hold harmless the department and its employees or agents against any claims arising out of compliance with this section.
(Bold emphasis in original.)

10. The State notes that Authority over the Convention Center was later reassigned to the Hawai'i Tourism Authority.

(Brackets in original.) (Footnote omitted.) We note, however, that such regulations are similar to existing indemnity statutes inasmuch as the regulations cited by the State require the execution of a separate license, permit, or lease agreement. *See, e.g.,* HAR §§ 15–110–36 and –40 (regarding the Convention Center Authority, requiring a license, permit, or lease agreement prepared by the authority); HAR §§ 3–70–7 and –15 (regarding the Stadium Authority, requiring execution of a licensing agreement).

Based on the foregoing discussion, we conclude that: (1) the DOT's governing statutes do not explicitly or implicitly authorize the DOT to issue administrative rules exonerating the State from the negligence of its employees (*i.e.,* they do not allow the DOT to impose upon private parties a duty to defend or indemnify the State); (2) HAR § 19–41–7 does not bear a reasonable relationship to the DOT's statutory mandate; and (3) the legislature's imposition of a statutory duty to defend and/or indemnify in other circumstances demonstrates the legislature's clear intent to reserve such power to itself.[11]

### IV. CONCLUSION

Based on the foregoing, we hold that the circuit court erred in granting summary judgment in favor of the State and in obligating appellants to defend and indemnify the State against Haole's claims. We, therefore, vacate the circuit court's December 16, 2004 final judgment and remand this case to the circuit court for further proceedings consistent with this opinion.[12]

---

**11.** Relying on HAR § 19–41–5, the State argues, in the alternative, that "even if consent [to assume the State's liability] were required, the McCabe parties and Matson both gave it, by operating in the State's harbor." HAR § 19–41–5 provides for an "implied agreement" that all users of the State harbors consent to abide by all the rules. HAR § 19–41–5 states that "[t]he use of the commercial waterways and facilities under the jurisdiction of the [DOT] shall constitute a consent to the terms and conditions" of its rules, and titles the rule "Implied Agreement." The State argues further that the duty here is "clear and unequivocal" and, thus, is valid. The McCabe parties contend that "there can be no valid consent to an unconstitutional or otherwise invalid regulation. In light of our conclusion that HAR § 19–41–7 is invalid and unenforceable, we need not address the State's alternative position.

**12.** Inasmuch as we conclude that HAR § 19–41–7 is invalid, we do not reach the parties' remaining arguments regarding (1) a determination of whether the State was solely liable and (2) whether the State's claims against the third-party defendants are barred by the LHWCA.