184 P.3d 191

**Lani CAPUA, Petitioner/Claimant–Appellant,**

v.

**WEYERHAEUSER COMPANY, Respondent/Employer–Appellee, Self–Insured.**

**No. 26369.**

Supreme Court of Hawai'i.

May 27, 2008.

As Amended May 29, 2008.

---

Dennis W.S. Chang, Honolulu, for petitioner/claimant-appellant.

Ronald Y.K. Leong (Dan Ko Obuhanych, with him on the briefs) (of Watanabe Ing Kawashima & Komeiji), Honolulu, for respondent/employer-appellee.

Dorothy Sellers, State Solicitor General, for amicus curiae State of Hawai'i.

MOON, C.J., LEVINSON, and DUFFY, JJ.; ACOBA, J., concurring separately, with whom NAKAYAMA, J., joins.

Opinion of the Court by MOON, C.J.

On February 27, 2008, this court accepted a timely application for a writ of certiorari, filed by petitioner/ claimant-appellant Lani Capua on January 24, 2008, requesting this court review the Intermediate Court of Appeals' (ICA) October 26, 2007 judgment on appeal, entered pursuant to its September 27, 2007 summary disposition order (SDO). Therein, the ICA affirmed the December 30, 2003 decision and order of the Labor and Industrial Relations Appeals Board (LIRAB), which, in turn, affirmed the decision of the director of the Department of Labor and Industrial Relations (director). Both the LIRAB and the director determined that, inasmuch as Capua was previously awarded permanent partial disability (PPD) benefits,

she was barred from receiving vocational rehabilitation (VR) services under Hawai'i Administrative Rules (HAR) § 12–14–36 (governing waiver of VR services under certain circumstances). Oral argument was held on April 17, 2008.

On application, Capua challenges—as she did before the ICA—the LIRAB's denial of VR services to her, arguing that HAR § 12–14–36 is inconsistent with Hawai'i Revised Statutes (HRS) § 386–25 (1993) (governing an employee's eligibility for VR services). Based on the discussion *infra*, we hold that the director exceeded his statutorily designated authority in promulgating HAR § 12–14–36 and, thus, the ICA erred in affirming the LIRAB's December 30, 2003 decision and order. Accordingly, we vacate the ICA's October 26, 2007 judgment on appeal and the LIRAB's December 30, 2003 decision and order and remand this case to the director with instructions to provide Capua with VR services, if she so desires at this time.

## I. *BACKGROUND*

### A. *The Injury and the Award of PPD Benefits*

On July 8, 1992, Capua suffered an on-the-job accident while employed as a sheet catcher [1] by respondent/employer-appellee Weyerhaeuser Company. Capua injured her lower back while lifting and restacking cardboard sheets that had fallen off a conveyor belt. On July 14, 1992, Weyerhaeuser filed a WC–1 Employer's Report of Industrial Injury, indicating that Capua "felt [a] sharp pain in [her] lower left back area" after "attempting to lift a stack (handful) of sheets." On August 12, 1992, Weyerhaeuser filed a second WC–1 report, accepting liability for Capua's injury.

[Capua] continued to work until September of 1992, when she was taken off work by her doctor. [Capua] was off work from

September to November of 1992, and for various periods thereafter. [Weyerhaeuser] provided [Capua] with temporary light duty work upon her return and she gradually worked her way back to full-time status.

Although Capua eventually returned to full-time status, she remained at her light duty position.

Some time after her July 9, 1992 injury, Capua apparently sought and was granted temporary total disability (TTD) benefits.[2] Thereafter, on June 18, 1996, Capua applied for PPD benefits. The director, on December 4, 1996, issued a decision awarding Capua, *inter alia*, eight percent (8%) PPD of the whole person as a result of her work injury. After she received her PPD award, Capua continued to work at Weyerhaeuser in her light duty position.

### B. *Capua's Termination and the Determination of Entitlement to VR Services*

In a letter to Capua, dated July 9, 1999, Weyerhaeuser advised Capua

that it would not be able to provide [her] with indefinite light duty work, and that VR services would help her secure alternate employment elsewhere. Since [Capua] had expressed an interest in VR, [Weyerhaeuser] advised her to contact Laurie Hamano, a VR counselor, for services, or any other counselor of her choice.

. . . .

On August 29, 2000, [Capua] met [Hamano] for an initial informational interview, but did not at that time commit to selecting [Hamano] as her VR provider. [Capua] later interviewed two other VR counselors. By October of 2000, [Capua] still had not decided on a VR provider.

On October 13, 2000 [Weyerhaeuser's] new human resource manager, Alan Maeda, met with [Capua] to discuss VR ser-

---

1. A sheet catcher's responsibilities entail collecting cardboard sheets that come out of a machine, measuring the cardboard sheets, and preparing them for the finishing department to make them into boxes.

2. Capua received TTD benefits between the period of September 1, 1992 and November 30, 1992. The record also indicates that Capua re-

ceived varying amounts of temporary partial disability (TPD) benefits between December 1, 1992 and March 14, 1993. Capua received additionally TTD benefits on February 16, 1994, May 2–3, 1994, August 3–7, 1994, August 11, 1994, February 3–19, 1995, March 14–15, 1995 and August 1–5, 1997.

vices. [Maeda] told [Capua] that she needed to make a decision about VR services soon. [Capua] wanted more time to think about VR, and promised to make a decision by October 18, 2000.

On the morning of October 16, 2000, Capua called Hamano and indicated that she intended to participate in the VR process with Hamano as her counselor. Later that afternoon, Weyerhaeuser issued a letter terminating Capua from her light duty position [hereinafter, the termination letter]. In its termination letter, Weyerhaeuser stated:

> Although not obligated to, Weyerhaeuser provided you with temporary light duty work in order to afford you time to find another job and further attempted to assist you in [VR]. However, as you know, [Weyerhaeuser] does not have "permanent" light duty work. We have only provided such light duty work to employees while they are looking for replacement employment.
>
> Based on your medical condition, the [c]ompany has made an assessment that we have no current position that you would be medically capable of fulfilling on a regular basis.
>
> In light of your refusal to seek [VR services] to help yourself in seeking alternative employment, we have no alternative but to terminate your temporary light duty position and therefore your employment at Weyerhaeuser.

Upon receipt of the termination letter, Capua informed Hamano that she had been terminated. However, Capua continued to

meet with Hamano and receive VR services because Hamano determined that VR services were appropriate for Capua.[3] Likewise, on November 21, 2000, the Department of Labor and Industrial Relations (DLIR) Disability Compensation Division (DCD) made a determination that Capua was eligible for VR services.[4]

Thereafter, on November 30, 2000, pursuant to HAR § 12–14–48,[5] Weyerhaeuser filed its request for reconsideration of the DCD's determination regarding Capua's eligibility for VR services. Weyerhaeuser, relying upon HAR § 12–14–36, contended that Capua was not entitled to VR services. HAR § 12–14–36 provides in relevant part that "[a]n employee who has been issued a[PPD] award by the director ... is determined to have waived the right to rehabilitation." As such, Weyerhaeuser argued that, because Capua had previously received an award for PPD benefits on December 4, 1996, she waived her right to VR services. Agreeing with Weyerhaeuser, the director entered a supplemental decision on May 8, 2001, finding that, under HAR § 12–14–36, Capua had waived her right to VR services. Consequently, Hamano ceased providing VR services to Capua.

## C. Appeal to the LIRAB

On May 18, 2001, Capua appealed the director's supplemental decision to the LIRAB. After a hearing, held on May 23, 2003, the hearing officer entered a proposed decision and order, pursuant to HRS § 91–11 (1993),[6]

---

**3.** Specifically, Hamano testified that, in her opinion, Capua was qualified for VR services because:

> [Capua] had limitations that precluded her return to what she was doing before. Therefore, that became part of [my] determination of it being feasible for services.
>
> I also have to indicate whether or not I have the skills and knowledge to be able to assist her to get to the place where she can return to work. So at that point in the initial evaluation we had stated that yes ... she had limitations, [Weyerhaeuser] stopped her from being able to return to [the] work she was doing, she had been in light duty. And therefore not able to return to what she was doing. Therefore, you know, she was deemed feasible for services.

**4.** The record provides no specific facts regarding the events surrounding Capua's entrance into the VR program.

**5.** HAR § 12–14–48(a) provides in relevant part: "Except as otherwise provided, determinations of the rehabilitation unit are considered final unless a written request for reconsideration is filed with the rehabilitation unit within ten calendar days from the date of the determination."

**6.** HRS § 91–11 provides:

> Whenever in a contested case the officials of the agency who are to render the final decision have not heard and examined all of the evidence, *the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposal for decision con-*

affirming the director's supplemental decision. The hearing officer entered the following proposed conclusions of law:

> Pursuant to [HAR] § 12–14–36 ..., an employee who has been issued a PPD award by the [d]irector is determined to have waived the right to rehabilitation. In this case, [Capua] was awarded PPD by the [d]irector in a December 4, 1996 decision. Under [HAR] § 12–14–36, [Capua] is not entitled to VR services. Accordingly, we conclude that the [d]irector did not err in denying [Capua] VR services.
>
> [Weyerhaeuser's] offer of VR after PPD was awarded was gratuitous and not required by law. However, having made the offer of VR, and having agreed to an October 18, 2000 deadline for [Capua] to accept VR, [Weyerhaeuser] could have acted more honorably in this case.

Both Capua and Weyerhaeuser filed exceptions to the proposed decision and order in accordance with HRS § 91–11, quoted *supra* note 6. On December 29, 2003, a hearing was held, wherein Capua argued, *inter alia,* that HAR § 12–14–36 could not serve as a ground to deny her VR services because HAR § 12–14–36 was "inconsistent" with HRS § 386–25. At the time of Capua's disability, HRS § 386–25 (1993) provided in relevant part:

> (b) *The director shall refer employees who may have or have suffered permanent disability* as a result of work injuries and who in the director's opinion can be physically or vocationally rehabilitated *to the department of human services or to private providers of rehabilitation services*

*taining a statement of reasons and including determination of each issue of fact or law necessary to the proposed decision has been served upon the parties,* and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to the officials who are to render the decision, who shall personally consider the whole record or such portions thereof as may be cited by the parties. (Emphasis added.)

7. HRS § 386–88 provides in relevant part:
 The decision or order of the appellate board shall be final and conclusive ... unless within thirty days after mailing of a certified copy of the decision or order, the director or any other party appeals to the [ICA] ... by filing a written notice of appeal with the appellate board.

*for such physical and vocational rehabilitation services as are feasible. ...*

> . . . .

> (g) *The eligibility* of any injured employee to *receive other benefits under this chapter shall in no way be affected* by the employee's entrance upon a course of physical or vocational rehabilitation as herein provided.

(Emphases added.) In essence, Capua argued that HAR § 12–14–36 conflicted with HRS § 386–25. Conversely, Weyerhaeuser contended that, inasmuch as HAR § 12–14–36 was "clear" and "unambiguous," there was "no room for exceptions." On December 30, 2003, the hearing officer issued an order, adopting the proposed decision and order *in toto.* Thereafter, Capua filed her notice of appeal with the ICA, pursuant to HRS § 386–88 (Supp.2007).[7]

**D. Appeal Before the ICA**

On direct appeal, Capua argued, *inter alia,* that HAR § 12–14–36 "[was] invalid as inconsistent with the Hawai'i [w]orkers' [c]ompensation [l]aw." Weyerhaeuser responded that Capua had no "right" to VR under HRS § 386–25 and, therefore, argued that the LIRAB correctly determined that HAR § 12–14–36 was "entirely consistent with the [VR] statute." On July 19, 2007, the ICA issued an order requesting that the Attorney General file an *amicus curiae* brief because "the appeal raise[d] a challenge to the validity of a regulation promulgated by the [d]irector of the DLIR."[8] Thereafter, on August 24, 2007, the Attorney General filed its *amicus curiae* brief, taking the position that HAR § 12–14–36 was valid.[9]

8. Specifically, the ICA requested that the Attorney General's brief address the following issue:

 Whether the portion of HAR § 12–14–36 providing that "[a]n employee who has been issued a[PPD] award by the director ... is determined to have waived the right to rehabilitation[ ]" is invalid as inconsistent with HRS [c]hapter 386.
 (some brackets in original and some added.)

9. Additionally, the Attorney General argued that, although HAR § 12–14–36 was valid, the LIRAB erred in finding that Weyerhaeuser's offer to provide VR to Capua was merely gratuitous. Accordingly, the Attorney General urged the ICA to reverse the LIRAB's decision because it believed that Weyerhaeuser's offer of VR was an offer that

444

On September 27, 2007, the ICA, in a 2–1 SDO, affirmed the LIRAB's decision, with Associate Judge Daniel R. Foley dissenting (ICA Dissent). Therein, as discussed more fully *infra*, the ICA rejected Capua's contention that HAR § 12–14–36 was "invalid as inconsistent with HRS [c]hapter 386." The dissent, however, asserted that HAR § 12–14–36 was "inconsistent with the express purposes contained in the language of HRS § 386–25" and stated that, "[i]nasmuch as the [LIRAB] relied on an invalid rule to deny Capua's petition for [VR] benefits, [he] would vacate and remand." ICA Dissent at 5–6, 8.

The ICA entered its judgment on appeal on October 26, 2007. On January 24, 2008, Capua filed her application for a writ of certiorari. Weyerhaeuser did not file a response. This court accepted Capua's application on February 27, 2008 and heard oral argument on April 17, 2008.[10]

## II. STANDARDS OF REVIEW

### A. Agency Decisions

Appellate review of the LIRAB's decision is governed by HRS § 91–14(g) (1993), which provides:

Upon review of the record[,] the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91–14(g), conclusions of law (COLs) are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3).

A COL is not binding on an appellate court and is freely reviewable for its correctness. Thus, the court reviews COLs *de novo*, under the right/wrong standard. *Tam v. Kaiser Permanente*, 94 Hawai'i 487, 494, 17 P.3d 219, 226 (2001) (citations, original brackets, and ellipsis omitted) (format altered).

### B. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable *de novo*." *Flor v. Holguin*, 94 Hawai'i 70, 76, 9 P.3d 382, 388 (2000) (original brackets, internal citations, and ellipses omitted). Further, "this court has accorded persuasive weight to the construction of statutes by administrative agencies charged with overseeing and implementing a particular statutory scheme." *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 276 n. 2, 971 P.2d 1104, 1111 n. 2 (1999). Nonetheless, "an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate." *Haole v. State*, 111 Hawai'i 144, 150, 140 P.3d 377, 383 (2006) (citation omitted).

## III. DISCUSSION

As previously stated, Capua contends that the ICA erred in affirming the LIRAB's decision and order, which denied Capua's request for VR services. Specifically, Capua argues that the ICA erred:

was made in exchange for terminating Capua's ten-year employment and, thus, was an offer supported by consideration. However, the ICA declined to address this argument "because it was not raised by Capua on appeal." SDO at 4 n. 3.

10. On March 25, 2008, State Solicitor General Dorothy Sellers filed, on behalf of the State of Hawai'i, a motion for leave to appear amicus curiae and to participate in oral argument [hereinafter, the State's motion]. We granted the State's motion on April 9, 2008.

1. ... in ignoring the central legal issue that [Capua's] right to VR benefits is waived by relying on an invalid administrative rule, HAR § 12–14–36, which is wholly inconsistent and contradicts HRS [c]hapter 386, a social legislation requiring broad liberal and beneficent interpretation and where there is no reference anywhere in HRS [c]hapter 386 or HRS § 386–25(b) that precludes an injured worker like [Capua] from asserting her statutory right to VR benefits[;]

2. ... by misapplying or misapprehending the fact that [Capua's] award of [PPD], which precludes her from finding gainful employment, is the very reason that she should be granted VR benefits and that HAR § 12–14–36 should be declared an invalid rule and totally disregarded[; and]

3. ... by deciding as a matter of law that HAR § 12–14–36 is valid by creating a reasonable deadline to accept VR benefits when in reality it is patently arbitrary and violates [Capua's] right to equal protection of law[.]

Inasmuch as (1) and (2) above relate to the sole issue whether the ICA erred in relying—as did the director and LIRAB—upon the allegedly invalid HAR § 12–14–36 to conclude that Capua waived her right to VR services, we address them together.

On appeal, as well as on application, Capua argued, *inter alia*, that HAR § 12–14–36 was invalid and, thus, inapplicable because it is inconsistent with, and directly contradicted, HRS § 386–25. In rejecting Capua's arguments, the ICA majority stated:

HAR § 12–14–36 establishes a reasonable deadline—measured by the employee's acceptance of compensation for PPD—for an employee who has suffered a PPD to obtain [VR] services. The regulation filled the void left by the statute's silence on the time by which an employee with a PPD would have to obtain [VR] services. The requirement that an employee secure [VR] services before accepting a PPD award is rationally related to the statutory purposes of [VR], which is to restore the employee's earning capacity and return the employee to work in an expeditious and a cost-effective manner.

Especially as applied to Capua, HAR § 12–14–36 was consistent with HRS [c]hapter 386. For Capua to receive PPD benefits, it was necessary for her medical condition to have stabilized to the point where no further improvement could reasonably be expected so that her PPD impairment could be rated. Capua's PPD award was issued more than four years after she had been injured and had returned to work. Thus, Capua had ample time to seek [VR] services before obtaining her PPD award. By virtue of HAR § 12–46–36, she was also on notice that by obtaining the PPD award, she was waiving her rights to [VR].

SDO at 3–4 (footnote omitted).

To the contrary, the dissent opined that:

The DLIR's "authority is limited to enacting rules and regulations which are reasonably related to carrying into effect the purposes" of [HRS c]hapter 386, and as such, the DLIR "may not enact rules and regulations which enlarge, alter, or restrict the provisions" contained therein. *Jacober v. Sunn*, 6 Haw.App. 160, 167, 715 P.2d 813, 819 (1986). As evinced by the text of HRS § 386–25 and its legislative history, HAR § 12–14–36 bears no reasonable relation[ ] to the [VR] statute. *Haole v. State*, 111 Hawai'i 144, 156, 140 P.3d 377, 389 (2006). Therefore, I conclude that the DLIR exceeded its statutory authority when it promulgated this rule, which I find to be inconsistent with the purpose of [VR].

ICA Dissent at 7.

■ Here, Capua argues that "the ICA disregarded the consistent legacy concerning the construction of the workers' compensation statute and [Capua's] challenge that the HAR § 12–14–36 is invalid." Capua asserts that, although "the [d]irector is charged with rule making to implement the legislation," it is "axiomatic that ... the rule cannot conflict with [the statute], nor contradict such a social beneficent legislation." Specifically, Capua contends that HAR § 12–14–36 is invalid because "[n]owhere does [HRS § 386–25] or

[its] legislative history limit an injured worker's right to VR benefits."

With regard to an agency's rule-making authority, this court has announced that:

[A] public administrative agency possesses only such rule-making authority as is delegated to it by the state legislature and may only exercise this power within the framework of the statute under which it is conferred. *Administrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down.* In other words, an administrative agency can only wield powers expressly or implicitly granted to it by statute. However, it is well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers expressly granted. The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency.

*Haole*, 111 Hawai'i at 152, 140 P.3d at 385 (emphasis added) (citations and original emphasis omitted) (format altered).

 In this case, the director was authorized to promulgate rules in accordance with HRS § 386–72 (1993), which provides that "the director . . . shall make rules, not inconsistent with [chapter 386], which the director deems necessary for or conducive to its proper application and enforcement." Specifically, the director promulgated HAR § 12–14–36 in an attempt to implement HRS § 386–25 (1993),[11] which provided in relevant part:

(a) The purposes of vocational rehabilitation are to restore an injured worker's earning capacity as nearly as possible to that level which the worker was earning at the time of injury and to return the injured worker to suitable work in the active labor force as quickly as possible in a cost-effective manner.

(b) *The director shall refer employees who may have or have suffered permanent disability as a result of work injuries and who in the director's opinion can be physically or vocationally rehabilitated to the department of human services or to private providers of rehabilitation services for such physical and vocational rehabilitation services as are feasible.* A referral shall be made upon recommendation of the rehabilitation unit established under section 386–71.5 and after the employee has been deemed physically able to participate in rehabilitation by the employee's attending physician.

. . . .

(c) Enrollment in a rehabilitation plan or program shall not be mandatory and the approval of a proposed rehabilitation plan or program by the injured employee shall be required. After securing such approval the director shall select a certified provider of rehabilitation services for the injured employee after consultation with the employee and the employer.

(d) An injured employee's enrollment in a rehabilitation plan or program shall not affect the employee's entitlement to [TTD]

---

11. We note that the parties, as well as the Attorney General—on direct appeal,—relied upon the 1998 version of HRS § 386–25, which version provided in relevant part that "[t]he director *may* refer employees who may have or have suffered permanent disability . . . for . . . [VR] services that are feasible." HRS § 386–25(b) (emphasis added). However, this court has stated that "the general rule in workers' compensation cases is that the date of disability determines what year's version of the [w]orkers' [c]ompensation [l]aw is applicable." *Tam*, 94 Hawai'i at 495, 17 P.3d at 227 (citation omitted). Here, Capua was injured on July 8, 1992; Weyerhaeuser filed a WC-1 Report of Injury on July 14, 1992, indicating that Capua had injured herself at work, and accepted liability for Capua's injury on August 12, 1992. Accordingly, we apply the statute that was in effect when Capua sustained the injury that caused her permanent disability. The statute that was in effect in 1992 is the same as the 1993 version. Moreover, even if the "date of disability" is the date that the director awarded Capua's PPD rating—*i.e.*, December 4, 1996—the 1993 version would still remain the appropriate version to apply in this case inasmuch as the legislature did not amend the statute until 1998. Thus, in our view, the version of HRS § 386–25(b) applicable here was the 1993 version, as quoted more fully *infra*. It appears from the ICA's SDO that the ICA applied the 1993 version of the statute because, although the ICA did not explicitly quote the statutory language, it stated that it was applying the statute that was in effect "[a]t the time Capua's injury became manifest." SDO at 2.

compensation if the employee earns no wages during the period of enrollment. If the employee receives wages for work performed under the plan or program, the employee shall be entitled to [TTD] compensation in an amount equal to the difference between the employee's average weekly wages at the time of injury and the wages received under the plan or program, subject to the limitations on weekly benefit rates prescribed in section 386–31(a). The employee shall not be entitled to such compensation for any week during this period where the wages equal or exceed the average weekly wages at the time of injury.

(e) The director shall adopt rules for additional living expenses necessitated by the rehabilitation program, together with all reasonable and necessary vocational training.

(f) If the rehabilitation unit determines that physical and vocational rehabilitation are not possible or feasible, it shall certify such determination to the director.

(g) *The eligibility of any injured employee to receive other benefits under this chapter shall in no way be affected by the employee's entrance upon a course of physical or vocational rehabilitation as herein provided.*

(Emphases added.) HAR § 12–14–36 provides in its entirety that:

(a) *An employee who has been issued a[PPD] award by the director* or an employee who has stipulated away the right to vocational rehabilitation with the approval of the director *is determined to have waived the right to rehabilitation.*

(b) The right to rehabilitation is preserved for any employee on [TTD] and any employee who has been adjudged permanently and totally disabled by the director.

(Emphases added.)

 It is well-settled that this court's foremost obligation when construing a statute

is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*State v. Kalani,* 108 Hawai'i 279, 283, 118 P.3d 1222, 1226 (2005) (citation omitted) (format altered). HRS § 386–25(b) expressly stated that the director *"shall* refer employees who may have or *have suffered permanent disability* as a result of work injuries and who in the director's opinion can be physically or vocationally rehabilitated to ... providers of rehabilitation services for such physical and vocational rehabilitation services as are feasible." (Emphasis added.) This court has stated that the term "shall" "generally will be construed as mandatory." *Malahoff v. Saito,* 111 Hawai'i 168, 191, 140 P.3d 401, 424 (2006) (citations omitted). Further, disability is defined as the "loss or impairment of a physical or mental function." HRS § 386–1 (1993). Thus, by its plain reading, HRS § 386–25(b) mandated the director to refer an employee who had been injured during the course and scope of employment and who either may suffer or has suffered permanent impairment of any physical (or mental) function to VR services "as are feasible." The existence of the phrase "have suffered permanent disability" within HRS § 386–25 appears to encompass employees who have been awarded PPD, such as Capua.[12]

Additionally, HRS § 386–25(g) specifically declared that an employee's participation in VR services "shall in no way ... affect[ ]" her eligibility to receive "other benefits under [chapter 386]." Although benefits was not defined within chapter 386, HRS § 386–1 provided that "compensation" means "all benefits," including "medical and rehabilitation benefits, *income indemnity benefits in cases of disability* or death, and the allowance for funeral and burial expenses." Stat-

**12.** Likewise, we note that the 1998 version of HRS § 386–25 retains the phrase "have suffered permanent disability." Thus, although the 1998 version, arguably, provides the director with greater discretion in referring injured employees to VR services, *see* Sen. Conf. Comm. Rep. No. 29 in 1998 Senate Journal, at 752, the 1998 version appears to contemplate that the director should, at his discretion, be able to refer those employees who "have suffered permanent disability," *i.e.,* received a PPD award, for VR services.

ed differently, an employee's decision to participate in VR services would not affect her eligibility to receive any "income indemnity benefits," such as PPD benefits. HRS § 386–25(g). Thus, HRS § 386–25 clearly sets forth an employee's entitlement to VR services upon the director's finding of feasibility.

Having so interpreted HRS § 386–25, we now examine HAR § 12–14–36, which was promulgated to implement HRS § 386–25. HAR § 12–14–36 unambiguously and plainly provides that an employee who has been awarded PPD benefits is deemed to have waived VR services. As stated above, the ICA believed that HAR § 12–14–36 was a proper exercise of the director's statutorily delegated rule-making power because "the regulation filled the void left by the statute's silence on the time by which an employee with a PPD would have to obtain [VR] services." SDO at 3. However, the ICA fails to explain how HAR § 12–14–36 "establishes a reasonable deadline . . . for an employee who has suffered a PPD to obtain [VR] services" and how it is "necessary for or conducive to," HRS § 386–72, the proper application and enforcement of HRS § 386–25 (i.e., that it was reasonably necessary to carry out the powers expressly granted). Id. Specifically, the ICA failed to point to where in the statute the director was granted the authority to waive an injured employee's right to VR services. Indeed, HRS § 386–72 grants the director the power to "make rules, not inconsistent with this chapter, which the director deems necessary for . . . its proper application and enforcement." (Emphasis added.) HAR § 12–14–36's waiver of VR services, however, cannot be consistent with HRS § 386–25, when the statute established an entitlement to VR services and specifically provided that an employee's entrance into a course of VR shall not affect his or her other benefits. Nowhere in the language of HRS § 386–25 does it provide—expressly or impliedly—that the director has the power to waive an employee's right to VR services or that, once a PPD award is issued the right to VR is extinguished. Moreover, contrary to

the ICA's assertion that HAR § 12–14–36 merely "establishe[d] a reasonable deadline," it is clear that HAR § 12–14–36 does more than establish a "deadline"; it creates a *total bar* to VR services when an employee receives a PPD award. We, therefore, hold that the director exceeded the bounds of the "rule-making authority [that was] delegated to [him] by the state legislature," *Haole*, 111 Hawai'i at 152, 140 P.3d at 385, in promulgating HAR § 12–14–36. Consequently, inasmuch as HAR § 12–14–36 exceeds the scope of HRS § 386–25, it is "invalid and must be struck down." *Id.* Accordingly, we also hold that the ICA erred in relying on an invalid administrative regulation to affirm the LIRAB's December 30, 2003 decision and order.[13]

## IV. CONCLUSION

Based on the foregoing, we hold that the ICA erred in affirming the LIRAB's December 30, 2003 decision and order inasmuch as the director exceeded his statutorily designated authority in promulgating HAR § 12–46–36. Accordingly, we vacate the ICA's October 26, 2007 judgment on appeal and the LIRAB's December 30, 2003 decision and order and remand this case to the director with instructions to provide Capua with VR services, if she so desires at this time.

Concurring Opinion by ACOBA, J.; with whom NAKAYAMA, J., joins.

I concur but note the following.

## I.

Hawai'i Revised Statutes (HRS) § 386–25 (1993) was in effect at the time of the July 8, 1992 accident of Petitioner/Claimant–Appellant Lani Capua (Petitioner), and of the July 14, 1992 filing of the WC–1 Employer's Report of Industrial Injury (WC–1) by Respondent/Employer–Appellee Weyerhaeuser Company (Weyerhaeuser). The statute stated that the Department of Labor and Industrial Relations (DLIR) director (director) "shall" refer employees for rehabilitative ser-

---

13. Based upon the above analysis, it is not necessary to examine Capua's remaining contention on application, to wit, that HAR § 12–14–36 is "patently arbitrary and violates [Capua's] right to equal protection of law."

vices that in the director's opinion, are able to be rehabilitated. In that regard, HRS § 386–25(b) and (h) read as follows:

(b) The director *shall* refer employees who may have or have suffered permanent disability as a result of work injuries and *who in the director's opinion can be physically or vocationally rehabilitated* to the department of human services or to private providers of rehabilitation services *for such physical and vocational rehabilitation [ (VR) ] services as are feasible.* A referral shall be made upon recommendation of the rehabilitation unit established under section 386–71.5 and after the employee has been deemed physically able to participate in rehabilitation by the employee's attending physician....

....

(h) [VR] services for the purpose of developing a[VR] plan *shall* be approved by the director and the director *shall* periodically review progress in each case.[1]

(Emphases added.) The majority states that "by its plain reading, HRS § 386–25(b) *mandated* the director to refer an employee who had been injured during the course and scope of employment and who either may suffer or has suffered permanent impairment of any physical (or mental) function to VR services 'as are feasible.' " Majority opinion at 447, 184 P.3d at 199 (emphasis added).

However, the wording of HRS § 386–25 suggests that although the term "shall" is ordinarily viewed as mandating an act, the director had discretion with regard to referring employees for VR depending on the director's opinion of whether the employees could be rehabilitated. Weyerhaeuser and Amicus Curiae the Attorney General of the State of Hawai'i (Attorney General) also make this argument. The language of the statute thus suggests that the Director was not mandated to refer any employee sustaining permanent impairment of function for VR services except those who in his opinion, could be rehabilitated.

The statute was amended in 1998 to substitute the word "may" for "shall." 1998 Haw. Sess. L. Act 256, § 1, at 873. This change resulted in the language of HRS § 386–25(b) that is in effect today and provides that "[t]he director *may* refer employees who may have or have suffered permanent disability as a result of work injuries and who, in the director's opinion can be vocationally rehabilitated ... for [VR] services that are feasible." (Emphasis added.)

Like the previous version, the 1998 version of the statute indicates that the director has discretion in determining whether an employee "can be vocationally rehabilitated." However, the revised language seemingly goes further in granting discretion to the director because even if the director determines that an employee can be vocationally rehabilitated, the revised statute's language indicates that the director has further discretion as to whether to refer such an employee for VR.

Weyerhaeuser cites the 1998 amended version of the statute to support its argument that "[Petitioner] has no statutory 'right' to [VR] benefits" because "[b]y statute, the [director] has the discretion to determine when to refer injured workers to [VR]." Similarly, the Attorney General cites the 1998 version of the statute to support its position that "there is no presumption in the law that every injured employee is entitled to VR in addition to the required disability compensation benefits." Petitioner also cites this revised version of the statute containing the word "may." However, the parties' citation to this amended version is not persuasive for the purposes of this case because the version of the statute in effect at the time of Petitioner's July 8, 1992 accident contained the word "shall" instead of "may."

As the majority states, " 'the general rule in workers' compensation cases is that the date of disability determines what year's version of the workers' compensation law is applicable.' " Majority opinion at 406 n. 11, 184 P.3d at 198 n. 11 (quoting *Tam v. Kaiser*

1. Read in conjunction with the other subsections of HRS § 386–25, subsection (h) appears to require that upon deciding to refer an employee for such VR services as are feasible, the director must approve VR services such that a VR plan can be developed and the director must periodically review the employee's progress.

450

*Permanente,* 94 Hawai'i 487, 495, 17 P.3d 219, 227 (2001) (citation omitted)) (brackets omitted). Thus, insofar as Petitioner's date of disability appears to be July 8, 1992, and the date of Petitioner's disability is not raised as an issue by the parties, July 8, 1992 is the relevant date for determining the version of the workers' compensation statute that is applicable here. Accordingly, the statute in effect at that time, containing the word "shall," is applicable to the instant case.

Despite the parties' incorrect citation to the 1998 amended version of HRS § 386-25, Weyerhaeuser and the Attorney General are arguably correct in contending that the director had discretion in referring Petitioner for VR benefits insofar as the director had discretion under the previous version of HRS § 386-25 to refer an employee depending upon his view of the employee's prospects for rehabilitation. Thus, in my view, the abuse of discretion standard applies. *See* HRS § 91-14(g) (1993) (stating that the court may affirm, reverse, or modify the agency decision or remand the case with instructions for further proceedings "if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are ... arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion").

Applying that standard, I believe both the director and the Labor and Industrial Relations Appeals Board (LIRAB) abused their discretion in denying VR services to Petitioner. The director based his decision to deny Petitioner VR benefits on the ground that under Hawai'i Administrative Rules (HAR) § 12-14-36, Petitioner had waived her right to VR services upon issuance of the permanent partial disability (PPD) award. Likewise, the LIRAB also based its decision to deny Petitioner VR benefits on the fact that Petitioner "was awarded PPD by the [d]irector" and therefore under HAR § 12-14-36, Petitioner "is not entitled to VR services." The sole reason cited by the Director and the LIRAB for denying VR services to Petitioner was that the issuance of a PPD award to Petitioner allegedly precluded an award of VR services under HAR § 12-14-36.

As discussed by the majority, that rule cannot be relied on as a basis for denying VR benefits "inasmuch as HAR § 12-14-36 exceeds the scope of HRS § 386-25" and therefore is " 'invalid[.]' " Majority opinion at 448, 184 P.3d at 200 (quoting *Haole v. State,* 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006)). *See also Capua v. Weyerhaeuser Co.,* No. 26369, slip op. at 4, 115 Hawai'i 476, 2007 WL 2800805 (App. Sept. 27, 2007)(SDO) (Foley, J., dissenting) (stating that nothing in HRS § 386-25 suggests that receipt of PPD precludes the employee's eligibility for VR services). Furthermore, although HAR § 12-14-36 states that an employee issued a PPD award "is determined to have waived the right to rehabilitation[,]" there is no similar provision in the HRS governing PPD that mentions a "waiver" of VR services. Moreover, nothing in the statutes remotely evinces notice to an employee that receipt of PPD benefits will preclude the receipt of VR benefits. Thus, respectfully, the argument by Weyerhaeuser and the Attorney General that Petitioner waived her right to VR by receiving PPD benefits is an unfounded gloss upon the statutes.

The decision by the Director and the LIRAB to deny Petitioner VR benefits was also an abuse of discretion because substantial evidence in the record supports Petitioner's position that she was entitled to VR benefits. The record shows that Weyerhaeuser believed Petitioner to be eligible for VR services as evidenced by its July 9, 1999 letter to Petitioner informing Petitioner that the company could not provide her with indefinite light work, that VR services would help her secure alternate employment elsewhere, and that Petitioner should contact Laurie Hamano (Hamano), a VR counselor. Weyerhaeuser reminded Petitioner in a letter dated August 9, 2000, to follow up with VR counselor Hamano regarding VR services. Moreover, Weyerhaeuser's human resource manager, Alan Maeda, met with Petitioner on October 13, 2000, and informed her that she needed to make a decision about whether to accept VR services soon. In addition, Dr. Gary Okamoto (Dr. Okamoto), Petitioner's

examining physician, repeatedly recommended that Petitioner receive VR services in written confirmation on May 25, 1999, and in interim reports dated November 1, 2000 and December 1, 2000.

Furthermore, the DLIR Disability Compensation Division (DCD)[2] determined on November 21, 2000, that Petitioner was eligible for VR services. The DCD stated in this determination that it reviewed Petitioner's pertinent records as well as "[Weyerhaeuser's] challenge of eligibility for [VR] services dated November 1, 2000." Even after considering Weyerhaeuser's objection to Petitioner's receipt of VR services, the DCD determined that Petitioner should receive VR services. Thus, it appears that Petitioner was eligible for VR services and would have received those services but for the argument raised by Weyerhaeuser that Petitioner's receipt of PPD barred her receipt of VR benefits under HAR § 12–14–36.

The foregoing facts demonstrate that Weyerhaeuser agreed to provide Petitioner with VR services and actively encouraged Petitioner to obtain those services, that Petitioner's examining physician recommended VR services for Petitioner, and that the DCD supported Petitioner's receipt of VR services even over the later objection by Weyerhaeuser. This constituted substantial evidence that Petitioner was entitled to VR benefits. The director and the LIRAB therefore erred in denying Petitioner's claim for VR benefits because they relied on an invalid rule in justifying the denial. Independent of that error, there is substantial evidence in the record that the VR benefits should have been provided. Hence, under either the prior version of HRS § 386–25 containing the term "shall," or the revised version of that statute containing the term "may" as advanced by Weyerhaeuser and the Attorney General, Petitioner should have been granted VR benefits.

**II.**

Weyerhaeuser, citing *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 389, 944 P.2d 1279, 1332 (1997), argues that "compensation for [PPD] compensates the worker for loss of bodily integrity rather than for loss of earnings" and is therefore "an indemnity payment[,] . . . not compensation to replace current loss of wages." (Some brackets omitted and some brackets added). Thus, Weyerhaeuser argues that a rule like HAR § 12–14–36 that limits VR benefits "to only those employees who have had an impairment in their earning capacity (*i.e.*, those employees on [temporary total disability] and [those] who are permanently and totally disabled)," while denying VR benefits to PPD awardees who "have had no legal impairment in their earning capacity," is appropriate given that the "purpose[ ] of [VR is] to restore employees' earning capacity."

I respectfully disagree with this argument. *Tabieros* quotes *Cuarisma v. Urban Painters, Ltd.*, 59 Haw. 409, 583 P.2d 321 (1978), which in turn, quoted a legislative committee report relating to a 1969 amendment to the workers' compensation statute dealing with partial disability. The report stated that " '[PPD] compensation is an indemnity payment for the loss or impairment of a physical function and . . . is not compensation to replace current loss of wages.' " *Tabieros*, 85 Hawai'i at 389, 944 P.2d at 1332 (quoting *Cuarisma*, 59 Haw. at 419–20, 583 P.2d at 326–27 (quoting Hse. Stand. Comm. Rep. No. 193, in 1969 House Journal, at 702)) (emphasis omitted) (ellipsis points in original). In *Cuarisma*, the appellee was awarded a lump-sum disfigurement benefit and total disability benefits at a weekly rate of $112.50. 59 Haw. at 410, 583 P.2d at 321–22. The appellants contended that an award for disfigurement could not be made in addition to an award for permanent total disability in excess of a specified limit on the aggregate liability of the employer because the awards provided overlapping compensation. *Id.*

2. The DCD is an office within the DLIR, responsible for administering workers' compensation law. All reports required to be filed under HRS chapter 386 must be filed with the DCD. HAR § 12–10–61(a). The DCD, *inter alia*, makes determinations regarding eligibility for VR services. Requests for reconsiderations of the determinations of the DCD may be made in writing within ten days of the determination pursuant to HAR § 12–14–48.

*Cuarisma* held that the awards could "stand together" because the award for disfigurement, which is included in the category of PPD, could be "regarded as compensation for impairment" and the award of permanent total disability [ (PTD) ] could be "regarded as compensation for loss of earning capacity[.]" *Id.* at 421, 583 P.2d at 327. However, *Cuarisma* did not hold that PPD awards do not provide compensation for loss of earning capacity. Indeed, the committee report cited by *Cuarisma* states only that PPD " 'is not compensation to replace *current* loss of wages' " and therefore, according to the committee report's hypothetical example, an employee receiving temporary total disability benefits for an arm injury would not be precluded from later receiving PPD for that same injury. *Id.* at 420, 583 P.2d at 327 (quoting Hse. Stand. Comm. Rep. No. 193, in 1969 House Journal, at 702) (emphasis added). Thus, the committee report does not indicate that PPD does not compensate an employee for loss of earning capacity, but instead states that PPD does not compensate the employee for loss of *immediate* earning capacity.

Furthermore, the holding in *Cuarisma* that the disfigurement award was for impairment cannot be expanded to apply to all PPD awards. The *Cuarisma* court held that the disfigurement award that was granted *in that case* was for physical impairment rather than disability because (1) the appellee's disfigurement consisted of surgical scars on his back and neck "with nothing to suggest that any loss of function is attributable to them," *id.* at 412, 583 P.2d at 323, and (2) the appellee was awarded a PTD benefit for PTD resulting from the injury to his back, *id.* at 412, 413, 583 P.2d at 323. In contrast, in the instant case, Petitioner's injury was related to a loss of function. "As a result of [Petitioner's] low back injury, [Dr. Okamoto] imposed permanent lifting restrictions that prevented [Petitioner] from returning to her usual and customary position" at Weyerhaeuser. Although Weyerhaeuser provided Petitioner with light duty work, Weyerhaeuser informed Petitioner that it would not provide her with such work indefinitely. Thus, because Petitioner's injury caused her to be unable to return to her prior employment

position and because Weyerhaeuser was unable to provide her with a permanent position performing light duty work, it cannot be concluded that Petitioner's injury did not result in disability that jeopardized her earning capacity. Also, in contrast to the appellee in *Cuarisma*, Petitioner was not awarded any total disability benefits for her injury. Furthermore, this court also expressly limited its decision in *Cuarisma*, stating that "[b]ecause of the possible distinguishing characteristics of other forms of [PPD], we do not intend to imply that the conclusions we have reached with respect to disfigurement awards are necessarily applicable with respect to awards for other forms of [PPD]." *Id.* at 413, 583 P.2d at 323–24.

Therefore, there is no authority for the propositions advanced by Weyerhaeuser that PPD benefits are "not compensation to replace loss of wages[,]" that PPD recipients have "no legal impairment in their earning capacity," and that denying VR benefits to PPD recipients is "consistent with the purposes of [VR which is] to restore employees' earning capacity."

## III.

As the majority notes, HRS § 386–25(g) expressly states that an employee's receipt of VR services "shall in no way" affect the employee's eligibility for "other benefits" under HRS chapter 386. HRS § 386–25(g) (1993). Correlatively, this provision can be interpreted to mean that receipt of other benefits such as PPD, should not affect an employee's eligibility for VR services. To hold otherwise would produce a legally absurd result. For instance, if as Weyerhaeuser and the Attorney General contend, receipt of PPD benefits constituted a waiver of VR benefits, then an employee receiving PPD benefits could not receive a subsequent award of VR services. However, under a plain reading of HRS § 386–25(g), an employee could first receive VR services and then receive a subsequent award of PPD because that subsection makes clear that a receipt of VR benefits does not affect an employee's eligibility for other benefits.

This result would be illogical and would unfairly penalize injured employees, like Petitioner, who happen to receive PPD benefits prior to any VR benefits. Thus, the only reasonable way to interpret HRS § 386-25(g) is to hold that VR services do not affect an employee's eligibility for other benefits and, conversely, receipt of other benefits does not affect eligibility for VR services.