*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-13-0000531
27-JUN-2016
12:52 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

WILLIAM A. ARTHUR, SR., Individually, and
THE ESTATE OF MONA ARTHUR thru William A. Arthur, Sr.
as the Personal Representative,
Respondents/Plaintiffs/Appellants/Cross-Appellees,

vs.

STATE OF HAWAI'I, DEPARTMENT OF HAWAIIAN HOME LANDS;
KAMEHAMEHA INVESTMENT CORPORATION; DESIGN PARTNERS INC.,
Respondents/Defendants/Appellees/Cross-Appellees,

and

COASTAL CONSTRUCTION CO., INC.;
SATO AND ASSOCIATES, INC.; and DANIEL S. MIYASATO,
Petitioners/Defendants/Appellees/Cross-Appellants,

_____

KAMEHAMEHA INVESTMENT CORPORATION,
Respondent/Third-Party Plaintiff/Appellee/Cross-Appellee,
vs.
KIEWIT PACIFIC CO.,
Respondent/Third-Party Defendant/Appellee/Cross-Appellee

_____

KIEWIT PACIFIC CO.,
Respondent/Fourth-Party Plaintiff/Appellee/Cross-Appellee,
vs.
PACIFIC FENCE, INC.,
Respondent/Fourth-Party Defendant/Appellee/Cross-Appellee.
_____

SCWC-13-0000531

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000531; CIVIL NO. 05-1-1981-11)

JUNE 27, 2016

RECTENWALD, C.J., McKENNA, POLLACK, WILSON, JJ., AND CIRCUIT
COURT JUDGE BROWNING, IN PLACE OF NAKAYAMA, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This case is a contract dispute between Petitioners/ Defendants/Appellees/Cross-Appellants Sato and Associates, Inc. and Daniel S. Miyasato (collectively, "Sato" or "Engineer"), and Respondent/Defendant/Appellee/Cross-Appellee Kamehameha Investment Corporation ("KIC" or "Developer").  Sato timely applied for writ of certiorari ("Application") on August 7, 2015 from a June 8, 2015 Judgment entered by the Intermediate Court of Appeals ("ICA") pursuant to its February 27, 2015 Opinion ("Opinion").  In relevant part, the ICA affirmed the Circuit Court of the First Circuit's ("circuit court['s]") "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment Against Defendant Sato & Associates, Inc. . . ." filed May 27,

2

2011.  Heavily relying on Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 85 Hawaiʻi 286, 944 P.2d 83 (App. 1997), the ICA concluded that pursuant to the Project Consultant Agreement ("Agreement") between Sato and KIC, Sato had a duty to defend KIC in the wrongful death action brought by Respondents/ Plaintiffs/Appellants/Cross-Appellees, William A. Arthur, Sr. ("William") and the Estate of Mona Arthur (collectively, "Arthurs") upon KIC's tender of defense to Sato.  See Arthur v. State, Dep't of Hawaiian Home Lands, 135 Hawaiʻi 149, 171, 346 P.3d 218, 241 (App. 2015).

In its Application, Sato presented two questions:

1) Was Pancakes wrongly decided?

2) In applying Pancakes, did the ICA fail to strictly construe the indemnity contracts at issue by treating Sato and other contractual indemnitors as insurers and the subject indemnity contracts as insurance policies?

(formatting added).  KIC opposed the Application, whereas Coastal Construction Co., Inc. ("Coastal"), a co-defendant in the Arthurs' suit, filed a response in support of the Application.

The Application was accepted on September 18, 2015. This court requested supplemental briefing from the parties addressing the following:

(1) Is the duty to defend presented in Sato's non-insurance, construction contract with KIC coextensive with Sato's duty to indemnify?

(2) Given case law and legislative history, does Hawaiʻi Revised Statutes [("HRS")] § 431:10-222 (2005), render void

3

any provision in a construction contract requiring the promisor to defend "the promisee against liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee?"

Upon considering the parties' briefs, oral arguments, and the relevant law, we hold as follows:

(1) HRS § 431:10-222 renders invalid any provision in a construction contract requiring the promisor to defend "the promisee against liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee";

(2) Pancakes, 85 Hawaiʻi 286, 944 P.2d 83 (App. 1997), does not apply to defense provisions in construction contracts; and

(3) the scope of a promisor's duty to defend that is imposed by a construction contract is determined at the end of litigation.

## II. Background

### A. The Arthurs' Wrongful Death Action

Mona Arthur ("Mona") and her husband, William, lived on property in the Kalawahine Streamside Housing Development ("Project") under an Assignment of Lease and Consent they executed with the Department of Hawaiian Home Lands ("DHHL") on

October 31, 2000. They typically gardened on the hillside behind their home about three times a week. To access the hillside, the Arthurs crossed a concrete drainage ditch and climbed over a two-foot-high chain link fence. Mona wore sneakers with snow spikes to prevent her from sliding down the hill.

On November 10, 2003, Mona and William gardened on the hillside. William left Mona's side for a few minutes to get some water for Mona, and when he returned, he found her lying in the concrete ditch. No one witnessed how Mona came to be in the ditch. Mona suffered severe head injuries, fell into a coma, and died on March 9, 2004.

The Arthurs subsequently filed suit for Mona's wrongful death on November 4, 2005. Their First Amended Complaint, filed November 8, 2005, alleged that Mona, while gardening on the hillside, "slipped and fell, rolled down the slope of the hillside over a fence, fell into the drainage embankment and hit her head against the concrete walling. . . . [Mona] . . . sustained injuries such that she was in a coma until her death . . . ." The Arthurs asserted Mona's injuries and death were due to the negligence of DHHL, KIC (as the developer), Design Partners, Inc. ("Design Partners") (as the architect), Coastal (as the general contractor), Sato (as the

5

civil engineer), and other "Does"; and that that negligence was composed of, but was not limited to, the following:

> a. Negligent design of the hillside area, including the fence and culvert;
>
> b. Negligent construction of the hillside area, including the fence and culvert;
>
> c. Negligent supervision of the construction of the hillside area, including the fence and culvert.[1]

These claims were unaltered in the Arthurs' Second Amended Complaint, filed December 3, 2009. **[95:315]** The Second Amended Complaint differed from the first primarily due to the addition of the following allegations, which asserted a punitive damages claim against KIC:

> 20. ELTON WONG was the project manager for [KIC].
> 21. At all times relevant, WONG was acting within the scope of his employment with [KIC].
> 22. ELTON WONG, ordered [Sato] to lower the chain link fence guarding the concrete drainage ditch from 4 feet to 2 feet.
> 23. The lowering of the fence reduced the construction costs and thereby increased Defendant's profits.
> 24. ELTON WONG, in his own handwriting, directed that the chain link fence be looked at for "value engineering".
> 25. ELTON WONG knew that the fence was intended to protect persons from falling into the drainage culvert.
> 26. ELTON WONG specifically met MONA ARTHUR at least 20 times and knew that she was going onto the steep hillside[.]
> 27. If ELTON WONG had allowed the fence to remain 4 feet high, MONA ARTHUR would not have been fatally injured; because of her lower center of gravity, a 4 foot high fence would have prevented MONA ARTHUR, who was 5'4" in height, from falling into the drainage ditch.
> 27.[sic] Instead of maintaining the safety of a 4 foot high fence, ELTON WONG ordered the fence lowered to 2 feet. He ordered the fence lowered simply to increase the

---

[1] The Arthurs also separately alleged the Association of Kalawahine Streamside Association ("AOAO") "was negligent with respect to the above including, but not limited to negligent inspection, maintenance and warning regarding the hillside area, including the fence and culvert."

6

Defendants [sic] profits, without consideration to the safety of persons such as MONA ARTHUR. He reduced the height of the fence knowing that residents, such as MONA ARTHUR, were required to maintain the steep hillside.

28. [KIC]'s overriding concern was for a minimum-expense operation, regardless of the peril involved.

29. [KIC] acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations.

30. [KIC]'s conduct constituted wilful misconduct or an entire want of care which would raise the presumption of a conscious indifference to consequences.[2]

## B. KIC's Tenders of Defense against the Arthurs' Claims Pursuant to the Hold Harmless Clauses in Its Agreements with Parties Involved in the Project's Construction

A March 10, 1998 Project Consultant Agreement ("Agreement" or "Contract") between KIC and Sato with respect to the Project described Sato's "scope of work" to involve preparing, among other things, grading and drainage plans, electric and telephone plans, and sitework civil drawings for various permit applications as necessary. The Agreement also contained a paragraph titled, "Indemnity by Consultant," which stated:

> Consultant [Engineer] hereby agrees to indemnify, defend and hold harmless Developer, and each of its officers, directors and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits, proceedings, judgments, awards, costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of work undertaken by Consultant [Engineer] outside the scope of this Agreement and/or out of the negligence or any willful act or omission of Consultant [Engineer], or any of its officers, directors, agents or employees, in connection with this Agreement or Consultant's [Engineer's] services or work hereunder, whether within or beyond the scope of its duties or authority hereunder. The provisions of this Section

---

[2] Partial summary judgment was later granted in KIC's favor with respect to the punitive damages claim. See infra Part II.C.

7

> shall survive completion of Consultant's [Engineer's]
> services hereunder and/or the termination of this
> Agreement.

("Hold Harmless Clause"). KIC's contracts with Design Partners, Coastal, and the general contractor for grading and site work, Kiewit Pacific Co. ("Kiewit"), each contained indemnity language, similar to that in the Hold Harmless Clause, requiring the subcontractor to "indemnify, defend, and hold harmless" KIC. Kiewit's contract with Pacific Fence, Inc. ("Pacific Fence") to construct a debris fence between the constructed homes and the adjacent hillside also contained language requiring Pacific Fence to indemnify and defend Kiewit.

By a letter dated December 15, 2005, KIC tendered its defense against the Arthurs' claims to Sato, pursuant to the Hold Harmless Clause. Although Kiewit was not named in the First Amended Complaint, based on its agreement with Developer, KIC also tendered its defense to Kiewit through KIC's attorney, Brad S. Petrus, by letter dated December 1, 2005.

On December 21, 2005, KIC then filed a third-party complaint against Kiewit, seeking, among other things, a declaration that Kiewit owed a duty to defend and indemnify KIC pursuant to their contract. KIC also filed cross-claims against Sato, Design Partners, and Coastal, alleging, among other things, that each party, pursuant to respective contracts,

8

"agreed to defend and indemnify" KIC against allegations such as those made by the Arthurs.

On January 31, 2006, Kiewit filed a fourth-party complaint against Pacific Fence, alleging, among other things, that Kiewit was contractually "entitled to an immediate defense and full indemnification from Pacific Fence" with respect to KIC's third-party complaint against Kiewit. By letter dated February 9, 2006, Kiewit tendered its defense to Pacific Fence.

Also on February 9, 2006, KIC filed a cross-claim against Pacific Fence, asserting, among other things, that by way of Pacific Fence's contract with Kiewit (and Kiewit's contract with KIC), that Pacific Fence agreed to defend and indemnify KIC against claims such as the ones brought by the Arthurs. KIC sought a declaration that "Pacific Fence owes a joint and several duty to defend . . . KIC" against the Arthurs' claims. KIC's February 9 filing was later construed by the circuit court to be KIC's tender of its defense to Pacific Fence.

Concurrent with KIC's filings and requests for defense and indemnity, DHHL filed a cross-claim on January 12, 2006 against KIC, Design Partners, Coastal, AOAO, and Sato, alleging, among other things, that the State was "entitled to defense, indemnification, contribution, subrogation and/or reimbursement from one or more Cross-claim Defendants." By letter dated March

9

6, 2006, DHHL tendered its defense to KIC.  In turn, KIC tendered the defense of DHHL to Kiewit.  Kiewit then tendered that defense to Pacific Fence.

By letters dated May 4, 2006 and July 26, 2006, Island Insurance Co., Pacific Fence's insurer, agreed to provide a defense to KIC, Kiewit, and DHHL.

According to KIC's attorney, by separate letters dated April 24, 2006, Sato and Kiewit agreed to participate on a pro-rata basis in KIC's defense subject to several conditions.

**C.   Circuit Court Proceedings with Respect to the Parties'
      Duties to Defend**

Numerous motions were heard by the circuit court regarding the merits of the Arthurs' claims and the parties' respective contractual duties to defend.  A summary of motions relevant to this appeal follows.

In September 2009, upon the available evidence after a lengthy period of discovery, Coastal filed a renewed motion for summary judgment based on the fact that its work did not extend beyond the individual dwellings in the Project; i.e., did not include the hillside, fence, or culvert.  In February 2010, the circuit court ruled on Coastal's Motion: (1) summary judgment was granted in favor of Coastal and against the Arthurs with respect to claims raised in the First Amended Complaint or the Second Amended Complaint; (2) partial summary judgment was

10

granted in favor of KIC and against any other party on claims "arising out of, resulting from, attributed to, connected with, or otherwise premised upon the work contracted to and/or performed by . . . Coastal"; and (3) any duty of Coastal's to defend KIC did not extend beyond February 25, 2010, the date of entry of the Order.

On March 2, 2010, KIC filed a "Motion for Partial Summary Judgment as to Plaintiffs' Claim for Punitive Damages [in its Second Amended Complaint]," arguing that even if the decision to lower the fence from 4 feet to 2 feet was "motivated by a desire to cut costs and boost profits," that was insufficient as a matter of law to prove the requisite elements justifying punitive damages. The circuit court granted KIC's Motion on May 24, 2010.

On May 6, 2010, Pacific Fence filed a Motion for Partial Summary Judgment, arguing that there was no question of fact that in installing the fence in the Project, Pacific Fence did so to specifications, and therefore was neither negligent, nor acted wrongly nor breached its contract with Kiewit. On September 16, 2010, the circuit court granted Pacific Fence's motion for partial summary judgment.

After ruling on multiple motions for partial summary judgment with respect to the parties' duties to defend, and in light of the circuit court's rulings on Coastal's, KIC's, and

11

Pacific Fence's motions for partial summary judgment, the circuit court's allocation of the parties' defense obligations as reflected in the Amended Final Judgment are:

1) defense of DHHL, is jointly and severally owed by KIC, Coastal, Kiewit, and Pacific Fence; wherein KIC's obligation is owed jointly and severally by Coastal and Kiewit; and wherein any obligation of Kiewit is passed through to Pacific Fence;[3]

2) defense of KIC, is jointly and severally owed by Design Partners, Sato, Coastal, Kiewit, and Pacific Fence; wherein Kiewit's obligation is passed through to Pacific Fence;

3) defense of Sato, which was tendered to and accepted by Kiewit, is passed through to Pacific Fence.

With respect to KIC's defense expenses, the court apportioned costs among Kiewit, Coastal, Sato, Design Partners, and Pacific Fence for various periods from December 1, 2005 through April 30, 2011, taking into consideration the various dates of tenders of defense and relevant court orders. The court did not apportion defense costs based on specific claims.

---

[3] Pacific Fence prevailed on its appeal to the ICA with respect to any pass-through duty to defend from Kiewit. In strictly construing the indemnity provision in Pacific Fence's subcontract with Kiewit, the ICA concluded that

> it did not extend to Kiewit's liability unless it arose at least in part from Pacific Fence's work under their subcontract. . . . Pacific Fence's alleged acts or omissions, as set forth in Arthur's Complaint,[*] were the basis for its duties to defend itself as well as portions of the defense of its contractors insofar as their liabilities potentially arose from Pacific Fence's acts or omissions.

Arthur, 135 Hawaiʻi at 176, 346 P.3d at 245.

*The ICA is incorrect. To clarify, Pacific Fence was not named as a defendant to the Arthurs' claims in either the First or Second Amended Complaints. Rather, Pacific Fence became a party to the litigation due to Kiewit's Fourth-party Complaint against it.

12

**D. Appeal to the ICA**

The various parties appealed the circuit court's Amended Final Judgment dated April 2, 2013, which encompassed its various orders.[4] Relevant here, Sato timely filed a Notice of Cross-Appeal of the Amended Final Judgment filed pursuant to the circuit court's May 27, 2011 "Order Granting [KIC]'s Motion for Partial Summary Judgment Against [Sato] and [Kiewit], and For Enforcement of Order Granting Motion." On June 4, 2013, Sato's Cross-Appeal was consolidated under CAAP-13-531.

Sato stated the following three points of error in its Opening Brief:

> 1. It was error for the lower court to order that Sato "had a joint and several duty to defend . . . KIC from December 15, 2005", and to enter judgment in accordance therewith. . . .
>
> 2. It was error for the lower court to find that Sato was obligated to pay KIC fees or costs in any amount or any percentage or for any period, and to enter judgment in accordance therewith. . . .
>
> 3. It was error for the lower court to enter judgment finding that Sato had "a contractual duty to indemnify and defend KIC," and to enter a declaratory judgment in favor of KIC and against Sato, jointly and severally, that Sato "had a contractual, joint and several duty to defend KIC."

Sato stated the circuit court erred in apportioning KIC's defense costs partly to Sato as the court should not have relied on Pancakes in arriving at its decision because Pancakes was "wrongly decided." Sato argued that the Hold Harmless Clause

---

[4] The Arthurs succeeded before the ICA with respect to their appeal of the circuit court's judgment entered in favor of AOAO, KIC, Sato, and Design Partners as to their negligence claims. See Arthur, 135 Hawaiʻi at 167-68, 346 P.3d at 236-37. Thus, litigation in this matter continues.

13

should be strictly construed, and when so construed, (1) Sato would not be liable for KIC's defense costs until a finding of liability against Sato with respect to the Arthurs' claims, and (2)

> Sato's indemnity obligations apply only to those claims which "arise out of" its own wrongful conduct. All other claims against KIC fall outside of Sato's defense obligation and the applicable indemnity provision. For example, the once-asserted punitive damages claim against KIC . . . is outside of Sato's defense obligation because it was premised on KIC's own allegedly egregious conduct on the Project.

Specifically, Sato asserted that HRS § 431:10-222, voids as against public policy, "construction contracts that purport to indemnify another for the other's own negligence." The statute reads:

> **Construction industry; indemnity agreements invalid.** Any covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance or appliance, including moving, demolition or excavation connected therewith, purporting to indemnify the promisee against liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee, is invalid as against public policy, and is void and unenforceable; provided that this section shall not affect any valid workers' compensation claim under chapter 386 or any other insurance contract or agreement issued by an admitted insurer upon any insurable interest under this code.

HRS § 431:10-222. Sato suggested that the circuit court's application of Pancakes "imposed large, potentially catastrophic costs upon the smallest players in [a construction] project, costs over which they have no ability to control by, e.g.[,] the selection of counsel."

14

KIC argued that Pancakes was not flawed and was consistent with relevant case law.  Moreover, it argued that HRS § 431:10-222 did not apply to Sato's case, as the statute does not refer to "professional design services" or to defense obligations.  KIC concluded by emphasizing that the "devastating consequences" to Hawaii's construction industry suggested by Sato has not, and will not, occur as a result of applying Pancakes to construction contracts as parties should have appropriate insurance protection to cover both liability and defense costs.

Upon re-examining Pancakes and the scope of a duty to defend as compared to the scope of a duty to indemnify, the ICA concluded:

> Expanding an insurer's duty to defend based on the "complaint allegation rule" to general indemnity contracts makes sense "because if the duty to defend was determined only after the ultimate issue of liability on each claim has been made, the case would be fully resolved before the duty [to defend] was triggered, and there would be nothing left to defend."  . . . .
>
> In light of such reasoning and the lack of a competing argument in Pancakes, we "discern[ed] no logical reason why the duty to defend based on indemnity contracts should not follow the same philosophy [of imposing a duty to defend at the outset of litigation] used in the insurance context."  . . . .
>
> Once an indemnitor is found to have a duty to defend, "[t]he indemnitor must bear the cost of a defense whenever any of the claims asserted may potentially come within the scope of an indemnity agreement, and the defense must continue until it is clear that the liability cannot possibly come within the scope of the indemnity."  Contrary to Sato's contention that its duty to defend would not be triggered until wrongful conduct on the part of Sato "is shown to have occurred, and be causally related to claims asserted by [Arthur]," Sato's duty to defend KIC was triggered upon the filing of the complaint and/or the

15

> tender of KIC's defense to Sato and that duty encompassed all claims that could potentially come within the scope of the indemnity.

Arthur, 135 Hawaiʻi at 170-71, 346 P.3d at 239-40 (citations omitted) (brackets in original).

Moreover, in response to Sato's argument that, pursuant to HRS § 431:10-222 it was not required to defend claims wholly unrelated to its actions, such as the Arthurs' punitive damages claim raised solely against KIC in the Second Amended Complaint, the ICA concluded:

> HRS § 431:10-222 establishes that Sato could not be held liable for the sole negligence or willful misconduct of KIC, but it does not bar Sato's duty to defend, and possibly to indemnify, in this case because Sato, as well as the other defendants were alleged to have been negligent. Thus, this application of HRS § 431:10-222 does not conflict with the circuit court's determination (1) that Sato's duty to defend KIC includes all claims potentially arising under the Sato Contract and not only for those arising from Sato's negligence or wilful misconduct, and (2) as discussed in the prior section, that Sato was liable for defense costs when KIC tendered its defense rather than after a judicial determination of Sato's fault.
>
> In sum, HRS § 431:10-222 restricts the scope of indemnification provisions in construction contracts, but it does not invalidate the application of the provision in the Sato Contract to [the] Arthur[s'] claims here, and Sato's duty to ultimately indemnify KIC and/or others is separate from its duty to defend. . . .

Id. at 241, 346 P.3d at 172.

## E.  Arguments before the Supreme Court

The arguments raised by Sato and KIC with respect to Sato's Application largely mirror the arguments the parties had raised before the ICA.  However, in supplemental briefing, the parties raised additional points.

16

Sato asserted that the duty to indemnify and duty to defend imposed by the Agreement were coextensive because the duties were contained in one sentence. Sato also argued that HRS § 431:10-222 is "clearly a remedial statute" and therefore "must be liberally construed to effect its intended purpose." Sato reasoned that a liberal construction would mean that the statute also banned promises to defend a promisee against liability caused by the sole negligence of the promisee in a construction contract.

Coastal emphasized that Pancakes inappropriately treated commercial contracts and policies of liability insurance similarly, when such agreements are markedly different. Among the differences include "their respective contractual purposes" and how indemnity provisions are construed in each type of contract: in commercial contracts, indemnity provisions are construed strictly against the indemnitee, whereas indemnity provisions in insurance policies are liberally construed in favor of the insured. Coastal echoed Sato's argument that HRS § 431:10-222 should be liberally construed, and added that the statute necessarily "precludes courts from determining the existence of any duty to defend at the commencement of litigation. . . . [as] [t]here would be no way of knowing whether a defense will end up violating H.R.S. § 431:10-222."

17

KIC argued that the duty to defend and the duty to indemnify are "distinctly different matters," and therefore are not coextensive. KIC pointed out that this court cited to Pancakes with approval in Haole v. State, 111 Hawaiʻi 144, 140 P.3d 377 (2006), when considering the scope of a duty to defend outlined in Hawaiʻi Administrative Rules ("HAR") § 19-41-7.[5] KIC reasoned: "By the foregoing, the Court endorsed the concept that the duty to defend, outside the context of an insurance contract but like an insurance contract, is not coextensive with the duty to indemnify. Rather, the duty to defend is broader than the duty to indemnify." Lastly, KIC urged this court to focus on the plain language of HRS § 431:10-222, which does not refer to the duty to defend, as did the Court of Appeals of Massachusetts when it was called upon to construe its state anti-indemnity statute in Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 786-87, 667 N.E.2d 907, 914 (1996).

---

[5] HAR § 19-41-7 provides:

> Liability. Agencies, masters, owners, operators, or charterers loading or unloading at state wharves shall indemnify, defend, and save harmless the department, its members, and employees from and against all losses, claims, demands, and suits for damages, including death and personal injury, and including costs and attorneys' fees, incident to or resulting from their operations on the property of the department and the use of its facilities except where the department has been proven to be solely and legally negligent.

Haole, 111 Hawaiʻi at 150, 947 P.2d at 383 (emphases removed).

18

## III.  Standard of Review

### A.  Interpretation of a Contract

"As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court."  Casumpang v. ILWU Local 142, 108 Hawaiʻi 411, 420, 121 P.3d 391, 400 (2005) (citation omitted).

### B.  Interpretation of a Statute

"Interpretation of a statute is a question of law which [is] review[ed] de novo."  Dupree v. Hiraga, 121 Hawaiʻi 297, 312, 219 P.3d 1084, 1099 (2009) (citation omitted).

## IV.  Discussion

### A.  HRS § 431:10-222 Voids As Against Public Policy Indemnification and Defense Clauses of a Promisee's Sole Negligence or Wilful Misconduct in Construction Contracts

HRS § 431:10-222 states in full:

> **Construction industry; indemnity agreements invalid.**  Any covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance or appliance, including moving, demolition or excavation connected therewith, purporting to indemnify the promisee against liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee, is invalid as against public policy, and is void and unenforceable; provided that this section shall not affect any valid workers' compensation claim under chapter 386 or any other insurance contract or agreement issued by an admitted insurer upon any insurable interest under this code.

The text of HRS § 431:10-222 is identical to its predecessor statute, HRS § 431-453 (1985), when that statute was initially

19

introduced and passed, save for the removal of gendered terms

(e.g., replacing "workmen's compensation" with "workers'

compensation," and "his agents" with "the promisee's agents"),

and the replacement of "chapter" with "code," and deletion of

"however."  Compare HRS § 431:10-222, with 1970 Haw. Sess. Laws

Act 169 ("Act"), § 2 at 304-05, and H.B. 1925, 5th Leg., Reg.

Sess. (1970).

The legislature clearly stated its reasons for the

Act's passage:

> The purpose of this Act is to invalidate, as against public policy, the prevalent practice in the construction industry of causing contractors to assume liability for the negligence of others by contract.  Such so-called "hold harmless" agreements are usually incorporated into contracts for construction projects on a "take-it-or-leave-it" basis; (i.e., to take out the necessary insurance or leave the bidding to someone else), and frequently require the contractor, engineer or architect, for example, to undertake assumption of liability for personal injury or property damage even where the same results from the "sole negligence" of persons over whom the indemnitor has no control or right of control.  This practice is, and precipitates further, a form of economic coercion by placing contractors in the inequitable position of paying prohibitive insurance premiums, which, if a small contractor cannot afford, precludes him from performing upon a project for which he is otherwise qualified, thereby effectively disenfranchising him under a system of free enterprise.  In an economy in which the construction industry contributes so significantly, this practice can only be considered as contrary to the public interest.
>
> This Act does not serve to relieve a contractor from liability when he is negligent; but when he is not, it places the responsibility for injury or damage where it properly belongs, any promise of indemnification notwithstanding.

Act 169, § 1 at 304.  See also S. Stand. Comm. Rep. No. 962-70,

in 1970 Senate Journal, at 1441-42 (observing that "[a]s a

result [of then-industry practice], general contractors, in

20

order to protect themselves, are compelled to include similar clauses in contracts with their subcontractors, and so forth."). Testimony submitted to the House Judiciary Committee from the Board of Underwriters of Hawaii noted that the then-industry practice "force[d] contractors to obtain broader insurance coverage than they would normally need with resulting increased costs in insurance premiums." Board of Underwriters of Hawaii, "Statement on Bill Relating to Declaring the Invalidity of Certain Indemnity Agreements in the Construction Industry," Mar. 19, 1970 (testifying in favor of H.B. 1925-70). Such increased premiums for "broad form contractual liability insurance [necessary to protect assets from uninsured losses caused by the negligence of third parties] is at least 300-400% of the cost of normal coverage." H. Stand. Comm. Rep. No. 420-70, in 1970 House Journal, at 979 (quoting testimony submitted by an insurance company executive who testified on behalf of the Construction Industry Legislative Organization). The House specifically elaborated upon the impact of the then-present practice on Hawaii's construction industry:

> Your Committee is satisfied that this practice is, and precipitates further, a form of economic coercion, particularly in instances where the small contractor is bidding in an open and highly competitive market involving owners of substantial means, such that where there is a wide disparity in bargaining power, it may be impossible for the contractor to refuse to enter into a contract containing such a provision, or, alternatively, even precluding him from performing upon a project for which he is otherwise qualified if he cannot afford the premium.

21

H. Stand. Comm. Rep. No. 420-70, in 1970 House Journal, at 979

(emphasis added).  The House went on to reason:

> Furthermore, it is apparent to your Committee that such
> "hold harmless" clauses contribute, at least in part, to
> the increasing costs of construction.  In an economy in
> which the construction industry contributes so
> significantly this is a very real problem which can only be
> remedied by legislative invalidation.

Id.

In sum, when enacting Act 169, the legislature was
plainly concerned with the prohibitive cost of insurance
policies to contractors — particularly, "small contractors," and
subcontractors, and so forth — necessitated by the inclusion of
"hold harmless" clauses in their contracts with owners.[6]  Absent
its intervention, the legislature concluded that high insurance
premiums caused higher construction costs, which would
negatively impact Hawaii's economy given that the construction
industry "contributes so significantly" to it.  See id.

HRS § 431:10-222, and its predecessor, HRS § 431-453,
do not employ language prohibiting the imposition on contractors
of a contractual duty to defend owners.  However, as a matter of
law, claims that fall outside the scope of contractual indemnity
do not trigger a promisor's duty to defend.  The framework of

---

[6]  This contrasts with the primary purpose of anti-indemnification statutes in
other states.  See, e.g., 1800 Ocotillo, LLC v. WLB Group, Inc., 196 P.3d
222, 225 (Ariz. 2008) ("Anti-indemnification statutes are primarily intended
to prevent parties from eliminating their incentive to exercise due care.")
(citation omitted).

22

the court's analysis in Haole v. State, 111 Hawaiʻi 144, 140 P.3d 377, illustrates this premise.[7]

In Haole, the court determined whether a duty to defend imposed by Hawaiʻi Administrative Rule § 19-41-7 was lawful by first analyzing whether a duty to indemnify imposed by the same regulation was valid. The court reasoned that even if the duty to defend was triggered at the outset of litigation by claims as alleged in the complaint (potentially rendering the scope of the duty to defend larger than the duty to indemnify), i.e., according to the "complaint allegation rule," if HAR § 19-41-7 was invalid as to imposing a duty to indemnify, then the rule was also invalid as to imposing a duty to defend. See Haole, 111 Hawaiʻi at 151, 140 P.3d at 384 ("[U]nder the 'complaint allegation rule,' if there is no potential for indemnification, then no duty to defend will arise.").

In the same manner, because HRS § 431:10-222 voids as against public policy indemnification clauses in construction contracts between owners and contractors as to "liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee[s],"

---

[7] In argument, KIC relied on Haole for the premise that this court had "approved" Pancakes because Haole had cited to Pancakes. Nothing in Haole supports this assertion.

23

HRS § 431:10-222 also operates to invalidate defense clauses for that same subset of claims.[8]  In sum, pursuant to HRS § 431:10-222, in the construction industry, a contractor is not contractually liable for the sole negligence or wilful misconduct of another, or for the defense thereof, as such contractual requirements would cause higher insurance premiums and greater construction costs, thereby harming Hawaii's economy.

Thus, to the extent the ICA's opinion suggests otherwise, we clarify that KIC's defense costs associated with defending against the Arthurs' punitive damages claim must be borne solely by KIC.

**B.** **Pancakes, 85 Hawaiʻi 286, 944 P.2d 83 (App. 1997), Does Not Apply to Defense Provisions in Construction Contracts**

**1.** **The Pancakes decision did not distinguish among non-insurance indemnity contracts.**

At issue in Pancakes was not a construction contract, but rather a management and leasing agreement signed between Pomare Properties Corporation ("Pomare"), a managing agent of Lahaina Shopping Center, and Sofos Realty Corporation ("Sofos"), that handled managing and leasing duties.  Pancakes, 85 Hawaiʻi

---

[8]  Moreover, we observe that as a practical matter, Act 169's mitigation of excessive insurance premiums would not be realized if the statute did not similarly prohibit defense clauses — litigation costs can be substantial, and insuring against such costs would likewise result in heightened premiums.

at 288, 944 P.2d at 85.  The managing and leasing agreement between Pomare and Sofos contained the following clause:

> Any actions taken by [Sofos] pursuant to the terms of this Agreement shall be done as agent of [Pomare Properties] and all obligations or expenses incurred hereunder will be for the account, on behalf of and at the expense of [Pomare Properties], with [Pomare Properties'] prior review and approval.
>
> Further, except for the willful misconduct or gross negligence of [Sofos], [Pomare Properties] shall indemnify, defend and hold [Sofos] harmless from and against any and all claims, demands, losses, liabilities and damages of every kind and nature arising from any cause whatsoever when [Sofos] is acting under this Agreement or the instructions of [Pomare Properties] or its designated representative. . . .

Id. at 289 n.2, 944 P.2d at 86 n.2 ("Responsibility Clause") (alterations in original).

In an effort to fill the shopping center with tenants, Lee Carter ("Carter"), a real estate salesperson working for Sofos, contacted the president of Pancakes of Hawaii, Inc. ("Pancakes").  According to Pancakes, Carter represented that the center would soon reach an eighty to eighty-five percent occupancy level.  After several months of negotiations, Pancakes entered into a lease agreement with Pomare in June 1990, built and opened a restaurant by September 1991, and ultimately closed the restaurant in December 1991 after suffering huge financial losses due to a lack of foot traffic through the mall as the shopping center was less than thirty-five percent occupied. Pancakes brought suit against the lessee of the shopping center, James Romig ("Romig"), Pomare, and Sofos, alleging fraud,

25

intentional and/or negligent misrepresentation, and breach of the covenant of good faith and fair dealing against all defendants; breach of contract against Romig and Pomare; and professional negligence against Sofos. See id. at 288–89, 944 P.2d at 85–86.

Sofos tendered the defense of the action to Pomare based on the Responsibility Clause. Pomare rejected the tender and Sofos filed a cross-claim against Pomare, demanding that Pomare honor the Responsibility Clause. See id. at 289, 944 P.2d at 86. The trial court ultimately ordered Pomare to defend Sofos against Pancakes's claims, and held Pomare liable for one-half of accrued attorney's fees and costs. See id. at 289–90, 944 P.2d at 86–87. Pomare subsequently filed a motion for reconsideration on the issue, stating that it had reached a settlement with Pancakes, dismissing all claims except the fraud and misrepresentation claims against Sofos. Accordingly, Pomare argued that the remaining claims were not covered under the Responsibility Clause and therefore Pomare's duty to defend Sofos was extinguished. The trial court denied Pomare's motion, stating that a fully executed agreement had not been submitted to the court, leaving "too many unanswered questions." Id. at 290, 944 P.2d at 87 (brackets omitted). Sofos ultimately succeeded in defeating Pancakes's claims. Upon entry of

26

judgment, Pomare filed a timely appeal on the issue of its duty to defend Sofos. See id.

On appeal, the ICA made the following determinations as to the scope of the duty to defend as presented in non-insurance indemnity contracts.

First, the ICA noted that the duty to defend as presented in insurance contracts is "fairly broad and separate and distinct from the duty to indemnify." Id. at 291, 944 P.2d at 88. The "complaint allegation rule" is followed with respect to these contracts, i.e., "where a suit raises a potential for indemnification liability of the insurer to the insured, the insurer has a duty to accept the defense of the entire suit even though other claims of the complaint fall outside the policy's coverage." Id. (quoting Hawaiian Holiday Macadamia Nut Co. v. Industrial Indem. Co., 76 Hawaiʻi 166, 169, 872 P.2d 230, 233 (1994)). The ICA then acknowledged that "Hawaiʻi has not yet expanded the insurer's duty to defend based on the complaint allegation rule to non-insurance indemnity contracts," but that it could "discern no logical reason why the duty to defend based on indemnity contracts should not follow the same philosophy used in the insurance context." Id. at 291-92, 944 P.2d at 88-89. The ICA noted that "[a] number of jurisdictions have freely imported the common law reasoning from insurance cases to

27

contractual indemnity cases." Id. at 292, 944 P.2d at 89 (cases cited).

> Finally, the ICA concluded:

> The duty to defend, to have any effect at all, must be determined when the complaint is filed. Otherwise, an indemnitor can simply refuse to [accept a] tender [of] defense whenever a suit alleges claims that are not covered by the indemnity provision. This kind of result would defeat the purpose of a duty to defend provision by forcing the indemnitee to shoulder the entire cost of defending suits that raise the potential for indemnification.

> In our opinion, the procedure used to determine the duty to defend based on indemnity contracts can follow the same procedure used in the insurance context. If a complaint alleges claims that fall within the coverage of the indemnity provision, then, according to the complaint allegation rule, the duty to defend begins. This is separate and distinct from the duty to indemnify. Once the trier of fact makes a determination on the claims in the lawsuit, the duty to indemnify will either arise or lie dormant. Claims falling within the indemnity provision will trigger the duty to indemnify, while claims falling outside the provision will relieve the indemnitor of his or her duty to indemnify. In our view, this is the only equitable interpretation that gives life to non-insurance indemnity clauses and prevents indemnitors from benumbing the duty to defend until after a case has been litigated.

Id. In applying this legal framework to Pomare's appeal, the ICA held that Pomare's duty to defend arose when Pancakes filed its initial complaint because Pancakes made at least some claims that fell within the scope of the Responsibility Clause, and Sofos's conduct fell within the purview of the management and leasing agreement. See id. at 295, 944 P.2d at 92.

**2. Pancakes does not apply to construction contracts.**

HRS § 431:10-222 makes clear that the legislature does not view all non-insurance indemnity contracts the same. Rather, as a matter of public policy, the legislature

28

statutorily limited the enforceable terms in construction contracts, as promises to indemnify or defend "the promisee against liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee" are voided by HRS § 431:10-222.

Accordingly, the holding in <u>Pancakes</u> does not apply to this case.[9] In <u>Pancakes</u>, the court applied the complaint allegation rule to the management and leasing agreement between Sofos and Pomare after it "discern[ed] no logical reason why the duty to defend based on indemnity contracts should not follow the same philosophy used in the insurance context." <u>Pancakes</u>, 85 Hawaiʻi at 291-92, 944 P.2d at 88-89. Here, however, there is a cogent reason why a construction contract's duty to defend should not necessarily follow insurance law: HRS § 431:10-222 and the legislature's express intent that each party to a construction contract be responsible for its "sole negligence or wilful misconduct."

**C. The Scope of a Promisor's Duty to Defend That Is Imposed by a Construction Contract Is Determined at the End of Litigation**

HRS § 431:10-222 does not expressly provide whether a contractual duty to defend (outside the prohibited bounds of HRS

---

[9] We do not, and need not, determine whether <u>Pancakes</u> is applicable to all non-insurance indemnity contracts.

29

§ 431:10-222) is determined at the outset of litigation based on the complaint allegation rule, or whether it is determined at the culmination of litigation based only on meritorious claims. It clearly prohibits, however, a promisor in a construction contract from being contractually required to defend a promisee against "liability for bodily injury to persons or damage to property caused by or resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee." See HRS § 431:10-222; Part IV.A. Thus, if the complaint allegation rule were to apply, it is possible in a case where initial allegations were brought against multiple parties, for example, that a promisor would be compelled to defend a promisee against negligence claims where ultimate liability is attributed solely to the promisee. Such a result contravenes HRS § 431:10-222 and our caselaw holding that "contracts of indemnity are [to be] strictly construed" against the indemnitee. Kamali v. Hawaiian Elec. Co., 54 Haw. 153, 161, 504 P.2d 861, 866 (1972).

As such, we hold that with respect to a duty to defend in a construction contract, the scope of a promisor's duty to defend is determined at the end of litigation. HRS § 431:10-222 effectively renders coextensive the duties to indemnify and defend in construction contracts.

30

## V.  Conclusion

For the foregoing reasons, we vacate the ICA's June 8, 2015 Judgment on Appeal entered pursuant to its February 27, 2015 Opinion, and remand this matter to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Kevin P.H. Sumida<br>for petitioners, Sato and<br>Associates, Inc. and Daniel<br>S. Miyasato | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Brad S. Petrus<br>for respondent, Kamehameha<br>Investment Corporation | /s/ Michael D. Wilson |
| | /s/ R. Mark Browning |
| Michiro Iwanaga and<br>Wayne M. Sakai<br>for respondent, Coastal<br>Construction Co., Inc. | |

